Affirmed and Memorandum Opinion filed November 23, 2005









Affirmed
and Memorandum Opinion filed November 23, 2005.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-05-00164-CV

____________

 

IN THE MATTER OF
D.C.G., A CHILD

 

 



On Appeal from the 306th
District Court

Galveston County, Texas

Trial Court Cause No. 03CV0189

 



 

M E M O R A N D U M    O P I N I O N

A jury found appellant, D.C.G., guilty of
two counts of aggravated sexual assault of a child, two counts of indecency
with a child, and one count of unlawful restraint.  The trial court committed appellant to the
Texas Youth Commission for an indeterminate sentence.  In two issues, appellant claims the evidence
is not factually sufficient to support the jury=s true verdicts,
and he received ineffective assistance of a counsel when his trial attorney
failed to inquire about the venire panel=s knowledge of an
outcry witness in the case.  We affirm.

Appellant, who was 13 years old at the
time of trial, and complainant, B.E., who was 9 at the time of trial, are
cousins.  Appellant=s mother, Cynthia
Garza, and B.E.=s father, Rick Evans, are sister and
brother.  Appellant, with his family, and
B.E., with his family, spent Thanksgiving 2002 in Kerrville, Texas with their
grandparents, Ron and Alice Evans. 








Located across the street from the
grandparents= house is a building with a shed located
behind that building.  B.E. testified
that he and appellant went into the unlocked shed where they found deer antlers
and part of an arrow.  They went back to
the house to show their grandfather and B.E.=s father, Rick
Evans, who were working on a car, what they had found.  After that, B.E. and appellant returned to
the shed.

B.E. testified about what occurred in the
shed.  B.E. fell in the mud and appellant
tried to wipe the mud off of B.E.=s pants.  Appellant then pulled down B.E.=s pants and hit
them on the ground three times.  B.E.
grabbed his pants from appellant and put them back on.  Appellant then told B.E. to pull his pants
down again because he was going to try to wipe the dirt off with his
hands.  When B.E. refused, appellant, who
was stronger than B.E., pushed him down and forced him to stay down.  Then appellant Athen put his
private part inside of my backside.@  Appellant threatened B.E. that if he told
anyone he would shoot him with his .22 gun. 
Afterwards, B.E. put his pants back on and ran back to the house.  B.E. did not tell anyone at that time what
had happened.

B.E.=s mother, Melinda
Evans, testified that a few days after Thanksgiving, B.E. was scared to be
around appellant.  B.E.=s behavior also
changed.  For example, he started having
nightmares of greater severity, throwing fits, not eating, wetting his bed, not
wanting to go to school, and not wanting to be out of her or his father=s sight.  Melinda talked to B.E. about it, and then she
talked to Rick.  

Rick spoke to B.E. about what had happened
with appellant.  Rick played pool with
B.E. at home, which was their way of spending time together.  When Rick asked B.E. what was bothering him,
B.E. indicated that something had happened to him in Kerrville.  Pointing to his penis, B.E. told Rick A[appellant] made
me allow him to touch me there.  And then
made me touch him there.@








In December 2002, B.E.=s parents took him
to a professional counselor, Debra King, who is the executive and clinical
director of Safe-T Counseling Center in Alvin, Texas.  In the first session, King met with Melinda
and was led to believe there had been possible sexual abuse.  B.E. eventually disclosed the Kerrville
incident to King.  B.E. told King
appellant had hurt his Ainsides.@  When she questioned B.E. about his Ainsides,@ he told her that
he and appellant had been playing in a shed across the street from his
grandparents= house when appellant started up Athat gross stuff.@  

When King asked B.E. about Athat gross stuff,@ B.E. told her
appellant asked him to show appellant his private part and appellant showed
B.E. his private part.  B.E. described to
King a scenario where appellant told him to take off his pants.  When B.E. did not want to, appellant pushed
him to the ground and took or yanked off B.E.=s pants.  Appellant also took his pants down.  B.E tried to leave, but appellant grabbed his
ankles and restrained him.  B.E. told
King that A[a]ppellant put his private in my behind,@ i.e., that
appellant inserted his penis into B.E.=s rectum.  King diagnosed B.E. as suffering from
post-traumatic stress disorder related to sexual abuse.

                            Factual Sufficiency of the Evidence








In his first issue, appellant complains
the evidence is factually insufficient to support the jury=s true
verdicts.  Although juvenile proceedings
are civil in nature, an adjudication requires proof beyond a reasonable
doubt.  In re J.D.P., 85 S.W.3d
420, 426 (Tex. App.CFort Worth 2002, no pet.); In re C.P.,
998 S.W.2d 703, 707B08 (Tex. App.CWaco 1999, no
pet.).  When reviewing the factual
sufficiency of the evidence, we need answer only one question:  Considering all of the evidence in a neutral
light, was the trier of fact rationally justified in finding guilt beyond a
reasonable doubt?  Zuniga v. State,
144 S.W.3d 477, 484 (Tex. Crim. App. 2004). 
There are two ways in which the evidence may be insufficient.  Id. 
First, when considered by itself, evidence supporting the verdict may be
too weak to support the finding of guilt beyond a reasonable doubt.  Id. 
Second, there may be evidence both supporting, and contrary to, the
verdict.  Id.  Weighing all the evidence under this balancing
scale, the contrary evidence may be strong enough that the
beyond-a-reasonable-doubt standard could not have been met and the guilty
verdict should not stand.  Id. at
485.  

The testimony of a child alone is sufficient to support a
conviction for sexual assault.  Jensen
v. State, 66 S.W.3d 528, 534 (Tex. App.CHouston [14th
Dist.] 2002, pet. ref=d); Ruiz v. State, 891 S.W.2d 302,
304 (Tex. App.CSan Antonio 1994, pet. ref=d).  Therefore, appellant=s factual
sufficiency challenge is premised on B.E.=s alleged lack of
credibility.  In support of his factual
sufficiency challenge, appellant contends B.E.=s therapist, Debra
King, testified that B.E.=s behavior could be due to anything.  Appellant, however, takes King=s comments out of
context.  The following exchange occurred
between King and appellant=s trial counsel:

Q.      Is
there anything in your notes of 12-15-02, that shows that you inquired of this
family or this mother about reasons why her child, the change in behavior after
Thanksgiving, might have been due to anything other than sexual abuse?

A.      No.  That=s what I put the report as. 
That=s what was reported to me.  So if I had anything else reported I would
have written down.

Q.      But
you would have had a discussion in your notes that these behaviors could be due
to anything else, correct?

A.      Correct.

Contrary to appellant=s assertion, King=s testimony was in
response to questioning during cross-examination that she did not include in
her report causes for the changes in B.E.=s behavior other
than what Melinda had told her about the possible sexual abuse.  

Appellant also claims King testified that interviewing
techniques can lead a child to believe that a non-event actually occurred.  The following testimony does not support this
contention:








Q.      You
indicated that you=ve read in several journals that
there are studies that indicate that repeated interviewing techniques can lead
a child to believe that [a] non-event actually occurred:  is that correct?

A.      I
have not researched it that that indicates that.  Actually what I have read is repeated
exposure [to] these type[s] of things retraumatizes the child over and over.

Q.      But
I am asking about children that believe that a non-event actually did
occur.  Is the research saying as far as
your knowledge that one of the things that can cause a child to believe a
non-event actually occurred could be repeated suggested interviewing
techniques?

A.      I would say a
very small percentage of research suggests that.

King testified that only Aa very small
percentage of research@ even supports the proposition that
interviewing techniques can lead a child to believe a non-event actually
occurred.  In any event, King testified
that when interviewing, she does not Astart accusing@ anyone of having
done anything or ask if something in particular occurred because that method is
Aoverly suggestive.@  Instead, if a child makes a comment that does
not make sense, King probes the child to learn what the comment means on that
child=s age level.  Here, B.E. told King his Ainsides hurt.@  When King asked B.E. what he meant by that,
he described what happened to him when he was playing in the shed with
appellant.  

Next, appellant points to the testimony of Dr. James
Lukefahr, a pediatrician at the University of Texas Medical Branch in Galveston
and the medical director of the ABC CenterCa facility for
examining children who may be victims of abuse or neglectCto support his
contention that there were no definitive findings of trauma or injury that
would support B.E.=s claim regarding what happened in
Kerrville.  While Dr. Lukefahr stated
there were no findings of definitive trauma or injury, he explained a lack of
such findings does not rule out sexual abuse because the anal area can heal
quickly and disclosure of the abuse often occurs long after it has occurred:








A.      Well,
quite frequently children make a disclosure of sexual abuse after quite a bit
of time has lapsed since the incident occurred. 
And so that even if there were some sort of penetrating injury,
frequently there=s enough time to where bruising or
abrasions or a finding of that nature would have time to heal.  Plus there=s some types of contact that really we would not expect to
leave a lot of dramatic physical findings.

Q.      Two
of the 12 charges in this case involve anal penetration.  How is it that if he were anally penetrated
twice could there be normal findings besides just the amount of time with that
tissue in that part of the body?

A.      The
anal area has a very dramatic ability to heal itself, especially superficial
injuries to the anus have been documented to heal very, very quickly.  And actually very significant injuries have
been documented to heal as quickly as 24 hours.

                                                    *        *       
*

A.      Well,
its actually for the reason I mentioned it is quite unusual to have definitive
physical findings in the anal area. . . .

                                                    *        *       
*

Q.      (By
Mr. Walker)  If it=s unusual to have definitive
medical findings, does that change the likelihood of whether or not any
penetration took place?

A.      Well,
if we don=t have definitive physical
findings, then that doesn=t rule out the possibility that
there may have been some penetration and that either did not leave physical
injury or that the physical injury was healed. 
That=s particularly true in cases where
the incident happened well before our examination.

Q.      Do
you remember the amount of time that passed between this incident and your
examination?

A.      Well,
the estimate provided by the mother was that the last incident occurred in late
November 2002.  And my examination was on
February 18, 2003.  So that=s close to three months.

Q.      That
would give the anal tissue plenty of time to heal?

A.      Yes, it would.

Dr. Lukefahr=s examination of
B.E took place on February 18, 2003, nearly three months after the abuse was
alleged to have occurred.  Therefore,
there was ample time for any injury to have healed.  








Appellant also claims the testimony of the
grandfather, Ron Evans, casts doubt on B.E.=s
credibility.  Appellant asserts that Ron
testified that it was Aonly about 20 feet between the shed . . .
and another building,@ and if such things had happened to B.E.,
he would have known.  Contrary to
appellant=s assertion, there is no reference in the
record to the distance between the shed, where the incident occurred, and the
building behind which the shed is located. 


The shed is located behind a building that
was located across the street from the grandparents= house.  Ron was working on car in the driveway at his
house at the time the incident allegedly occurred.  Without mentioning the specific distance
between the shed and where he was in the driveway, Ron stated that he would
have been able to hear any screaming or commotion in the shed because it is not
that far away.  However, an investigator
for the Kerr County Sheriff=s Office testified
that adults across the street would not be able to monitor a teenager and young
boy in the shed.  Moreover, B.E. might
not have screamed out because appellant told him he would shoot him if he told
anyone, keeping B.E. quiet during the abuse. 

Appellant also relies on testimony by Ron that he had
observed B.E. lying in the past, but he had never known appellant to lie and
appellant was a truthful person.  Ron
testified about the following:

A. 
[B.E.] would lie about where he had been while his father or mother
would ask him or his grandmother would ask him he would break a toy or a bike
and we would say what happened, [B.E.] 
Did you hit a rock, did you -- what happened here?  He=d say, I don=t know anything about it. 
Yet we knew he did.  We witnessed
it.

Q. 
Was this just normal kid behavior? 
I mean did Victoria and Marion and [appellant] do the same thing or was
it different in [B.E.]?

A. 
At the time I just assumed it was normal.  I didn=t take anything seriously about it.

                                                    *        *       
*








Q. 
But you=re saying that you observed [B.E.]
doing those things about lying.  Did you
observe [appellant] doing the same thing.?

A.  No, I did not.

Ron testified about minor lies told by a
small child, which he admitted he did not take seriously at the time.  Moreover, Ron has never believed appellant
sexually molested B.E., and wanted this resolved within the family without the
authorities becoming involved.  Ron
testified that he does not like the embarrassment of a sexual assault allegation
in his family.  Trudy Davis, Executive
Director of the Advocacy Center for Children in Galveston County, testified it
is typical for family members not to believe what happened and to protect the
guilty.  

Relying on testimony by the grandmother, Alice Evans, and
appellant=s mother, Diane Garza, appellant argues
B.E.=s testimony that
the assault lasted 30 to 40 minutes lacks any credibility.  Alice testified that she kept her eyes on
B.E. while he was at her house because he was prone to getting into a lot of
trouble.  Cynthia testified that B.E. and
appellant did not play together for more than 15 minutes at a time without her
checking on them.  However, Ron testified
there Awas no need@ to watch the
children:  

Well, when Melinda
was shopping my wife [Alice] and Cindy was [sic] watching the baby.  The kids were just playing.  They were playing around the house.  Was there anybody sit [sic] there with their
eyes specifically watching the children, no. 
There was no need to. . . . Everybody was having a good time.  And they were all old enough that we didn=t feel, I didn=t feel that they
needed to be watched continually except for the baby, and she was.@  








Moreover, B.E. did not testify that the
assault occurred over a 30 to 40 minute period of time.  B.E.=s therapist, Debra
King, testified that based on B.E.=s description of
the incident in Kerrville, it lasted A[m]aybe 45 minutes@ and doubted that
it could have been as short as 15 minutes. 
However, there is no definitive evidence regarding the amount of time
that elapsed during the incident.  King=s testimony is based
on what was described to her by a young boy. 

Appellant also asserts his testimony that
B.E. became angry when appellant would not let him play with his PlayStation
over Thanksgiving further puts B.E.=s credibility in
doubt.  According to appellant, B.E. was
mad at him and promised to get revenge against him for not allowing B.E. to
play with his PlayStation.  B.E.,
however, testified that he never told appellant that he would lie in order to
get him in trouble over the PlayStation. 


Appellant also relies on his testimony
that he Acouldn=t get away from
[B.E.]  Everywhere I went he=d follow me,@ and his sister=s testimony
(Krystal Garza) that B.E. wanted to be around appellant all weekend, to imply
that if any abuse had occurred, B.E. would not have wanted to be around
appellant at all.  However, Trudy Davis,
Executive Director of the Advocacy Center for Children in Galveston County,
explained that a child who is a victim of sexual abuse desires a Anormal@ relationship with
the offender and will enter into normal activities with the offender with the
hope that the sexual abuse will not occur again. 

Appellant further argues B.E.=s own prior
inconsistent statement given to a trained forensic interviewer in which he
denied that appellant had ever touched him inappropriately is sufficient
substantive evidence to support a reasonable doubt finding.  First, we note that appellant has failed to
provide a citation to the record to support this claim.  In any event, Carmen Crabtree, a forensic
interviewer at the Advocacy Center for Children, testified that she conducted a
videotaped interview with B.E. on February 10, 2003, in which he told her that
no one had touched him and he was not asked to touch anyone else.  However, B.E. spoke of Asome bad things
[that occurred] in the shed in Kerrville.@  B.E. testified that he told Ms. Crabtree that
appellant had touched him on his legs because he had dirt on them, but that
when she asked him if appellant had touched him anywhere else, he said no.  When Ms. Crabtree asked him if he was scared
of anyone, he explained that he said no because he was Areally nervous
then.@  








Appellant was charged with terroristic
threat, assault, injury to a child, and two counts of indecency with a child
with regard to an alleged incident in the bathroom of B.E.=s home (AGalveston incident@).  However, the jury found Anot true@ with regard to
each of these offenses.  B.E.=s therapist, Debra
King, testified that B.E. recanted what he had told her about the Galveston
incident when he knew the trial was coming up, but he never recanted the
Kerrville incident.  King explained a
child victim of sexual abuse might recant because he sees his world come apartChis family starts
fighting and he has contact with law enforcement officersCand he then begins
to regret having told anyone about the abuse. 
King further stated that the younger the victim, the more likely he is
to believe that if he says the abuse did not occur, then his problems will go away.  King testified that B.E. was upset about the
family discord that arose after he had told about the abuse.  

Trudy Davis, executive director of the
Advocacy Center for Children in Galveston County, also testified about the
reasons a child might recant.  Davis explained
the child is the one who is usually blamed for the sexual activity and
outcry.  The family may not believe the
child.  The child will recant the
allegation and say nothing happened so that his world can return to
normal.  The child wants his family to
love and care about him again, even if that includes a continued, forced sexual
relationship with the abuser.  

The jury is the exclusive judge of the
credibility of the witnesses and the weight to be given their testimony.  Whitaker v. State, 977 S.W.2d 595, 598
(Tex. Crim. App. 1998).  It is within the
province of the jury to resolve any conflicts and inconsistencies in the
evidence.  Heiselbetz v. State,
906 S.W.2d 500, 504 (Tex. Crim. App. 1995). 
Moreover, the trier-of-fact is free to believe or disbelieve either part
or all of a witness= testimony.  Jones v. State, 984 S.W.2d 254, 258
(Tex. Crim. App. 1998).  








It was jury=s responsibility
to decide the credibility of the witnesses. 
The jury was entitled to believe B.E.=s testimony and
disbelieve the testimony of appellant and the members of the family who
testified in favor of appellant, and to resolve any inconsistencies in favor of
B.E., which apparently it did. 
Considering all of the evidence in a neutral light, we conclude the jury
was rationally justified in finding appellant guilty beyond a reasonable
doubt.  Appellant=s first issue is
overruled.

                              Ineffective Assistance of Counsel

In his second issue, appellant claims
ineffective assistance of counsel due to his trial counsel=s failure to
strike a juror who was biased in favor of one of the State=s outcry
witnesses.  Both the United States and
Texas Constitutions guarantee an accused the right to assistance of
counsel.  See U.S. Const. amend. VI; Tex. Const. art. I, ' 10; Tex. Code Crim. Proc. Ann. art. 1.05
(Vernon 1977).  The right necessarily
includes the right to reasonably effective assistance of counsel.  Strickland v. Washington, 466 U.S.
668, 686 (1984).  The United States Supreme
Court has established a two‑prong test to determine whether counsel is
ineffective.  Id.  Appellant must first demonstrate his counsel=s performance was
deficient and not reasonably effective.  Id.
at 688B92.  Thereafter, appellant must demonstrate the
deficient performance prejudiced his defense. 
Id. at 693.  Essentially,
appellant must show that his counsel=s representation
fell below an objective standard of reasonableness, based on prevailing
professional norms, and there is a reasonable probability that, but for his
counsel=s unprofessional
errors, the result of the proceeding would have been different.  Id.; Valencia v. State, 946
S.W.2d 81, 83 (Tex. Crim. App. 1997).  

Without deciding whether appellant=s trial counsel=s performance was
deficient and reasonably defective, we shall address whether trial counsel=s performance
prejudiced appellant=s defense. 
Counsel=s alleged errors, even if professionally
unreasonable, do not warrant setting the conviction aside if the errors had no
effect on the judgment.  Strickland,
466 U.S. at 691.  Appellant must prove
that counsel=s alleged errors, judged by the totality
of the representation, denied him a fair trial. 
McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996), overruled
on other grounds by Mosley v. State, 983 S.W.2d 249 (Tex. Crim. App.
1998).  If appellant fails to make the
required showing of either deficient performance or prejudice, his claim
fails.  Id. 








The record shows that while appellant=s trial counsel
asked the venire panel if anyone knew or had a relationship with appellant or
his parents, Lewis and Diane Garza, she did not ask if anyone knew B.E., his
parents, or any other members of his family. 
After the jury had been sworn in and the State had read a portion of the
petition, with appellant waiving any further reading of it, one of the jurors,
John Jorgensen, raised his hand.  The
judge called Jorgensen up to bench where Jorgensen informed the judge that he
knew B.E.=s father, Rick Evans.  The following dialogue took place:

MR. JORGENSEN: I just wanted to let you know I=m familiar with Rick Evans.  I=m friends with him. 
He=s a friend of mine.

THE COURT:  Will that make any difference in your decision[?]

THE WITNESS:  I didn=t know anything about this before.

THE COURT:  Nobody asked you about it.

MR. JORGENSEN: I just wanted to be sure you knew.

THE COURT:  Do you think that would affect your decision
in this case in the way you look at the evidence?

MR. JORGENSEN: I=ve known him for a long time.  I=ve always known him to be trustworthy.[1]

THE COURT: 
You=ve told us about it and that=s exactly what you
should do.  You can resume your seat at
this time.  

The trial court overruled appellant=s objections to
allowing Mr. Jorgensen to remain on the panel. 









Appellant claims that because Rick=s testimony was
critical to allegations regarding his conduct in Kerrville, there was a
reasonable probability that Jorgensen=s predisposition
to find Rick=s testimony regarding B.E.=s outcry credible
undermined confidence in the outcome of his trial.  In support of this assertion, appellant first
relies on Jorgensen=s statement that AI=ve known him for a
long time.  I=ve always known
him to be trustworthy.@ 
Appellant also complains that when asked if he could give no more weight
to Rick=s testimony than
he would to appellant=s testimony because of his relationship
with Rick, Jorgensen responded that he could not.  Contrary to this assertion, we find no
support in the record for the alleged statement.  Instead, the page and volume in the record to
which appellant cites contains a discussion among the trial judge, defense
counsel, and the prosecutor about whether to leave Jorgensen on the jury
panel.  

The trial court held a hearing on
appellant=s motion for new trial in which he raised
his ineffective assistance claim. 
Jorgensen was employed as a utilities operations technician at UTMB when
he knew Rick.  Rick worked for Siemens, a
major company that does direct digital control systems for temperature control
in the commercial marketplace, which had a contract with UTMB.  Rick was the project manager for Siemens= on-site office at
UTMB for a little less than two years. 
Rick=s role was to interface with facilities
management, not the technicians; Jorgensen was not part of the management.  

Jorgensen could only guess, but he thinks
he worked with Rick for about a year. 
Jorgensen testified that he had some dealings with Rick because Athey were working
out of our shop until they got their own shop.@  Jorgensen worked in close proximity to Rick
for a couple of months two or three years prior to the time of the trial, but
once Siemens had its own office at UTMB, Rick was not in his office or anywhere
near his office and they did not share the same break room.  Rick, on the other hand, testified that he
never officed with the UTMB facilities people and never shared an office with
Jorgensen.  








Jorgensen did not know anything about Rick=s private life
through his contact with him at work. 
Jorgensen knew Rick had a son and a daughter, but did not know he had
other children.  Jorgensen testified that
he met Rick=s wife once at a function at the Masonic
Lodge in Hitchcock where they sat at the same table.  Jorgensen knew Rick would be at the Masonic
Lodge, but they did not go there together. 
Jorgensen considered Rick a friend at work, but Awe never hung out
except for that one time that I can remember that we went to that lodge meeting
. . .@  Rick testified that although he saw Jorgensen
at the Masonic Lodge on that occasion, the only interaction he had with
Jorgensen was to say hello.  Since Rick
left that project for Siemens at UTMB in 2002, Jorgensen has neither worked
with him nor had any other relationship with him.  

Jorgensen testified that Rick was Avery truthful in
his business dealings,@ and personally, Aseemed honest@ to him.  When asked if he found Rick=s testimony at
trial truthful, Jorgensen responded, AI guess I did. . .
. The part where he talked about talking to [B.E.] about what had happened and
trying to get, you know, get him to tell him exactly what happened I found
that, that seemed very truthful.@  Jorgensen believes he was fair in this case
and his being acquainted with Rick did not have any affect on his verdict.  

We find that allowing Jorgensen to remain
on the jury panel did not undermine confidence in the outcome of this
case.  At best, Jorgensen had known Rick
in a workplace setting a couple of years prior to trial and had not had any
contact with him since Rick had left the Siemens project at UTMB.  Moreover, Jorgensen testified that he thought
he was fair in this case.  Finally, B.E.=s testimony is
sufficient to support appellant=s conviction.  See Jensen, 66 S.W.3d at 534; Ruiz,
891 S.W.2d at 204.  Appellant=s second issue is
overruled.

          Accordingly, the judgment of the trial
court is affirmed.  

 

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment
rendered and Memorandum Opinion filed November 23, 2005.

Panel
consists of Justices Hudson, Frost, and Seymore.











[1]  Emphasis
added.