**In the Matter of J.D.P., a Juvenile.**

No. 2–01–282–CV.

Court of Appeals of Texas, Fort Worth.

Aug. 22, 2002.

Stephen R. Bjordammen, Wichita Falls, for Appellant.

Barry L. Macha, Criminal District Attorney, Starla Jones, Douglas L. Baker, F. Dobie Kosub, Assistant Criminal District Attorneys, Wichita Falls, for Appellee.

PANEL F: DAY, LIVINGSTON, and HOLMAN, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

Appellant J.D.P. was charged with engaging in delinquent conduct by reckless injury to a child and with burglary of a habitation. Upon Appellant's motion, the two offenses were severed by the trial court for separate trials. Trial proceeded on the reckless injury to a child charge and the jury returned an adjudication verdict and a disposition verdict, sentencing Appellant to twenty years in the Texas Youth Commission (TYC). In four issues, Appellant complains of the legal and factual sufficiency of the evidence to support the adjudication and disposition of his case. We affirm.

### STANDARD OF REVIEW IN THE ADJUDICATION PHASE

In the adjudication phase of a juvenile case, the criminal legal and factual sufficiency standards of review are employed. *In re G.A.T.*, 16 S.W.3d 818, 828 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *see In re J.L.H.*, 58 S.W.3d 242, 245 (Tex.App.-El Paso 2001, no pet.). In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict. *Cardenas v. State*, 30 S.W.3d 384, 389–90 (Tex.Crim.App.2000); *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim. App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim.App.), *cert. denied*, 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim.App.2000); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996). Evidence is factually insufficient if it is so weak as to be clearly wrong and manifestly unjust or the adverse finding is against the great weight and preponderance of the available evidence. *Johnson*, 23 S.W.3d at 11. Therefore, we must determine whether a neutral review of all the evidence, both for and against the finding, demon-

strates that the proof of guilt is so obviously weak as to undermine confidence in the verdict, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Id.* In performing this review, we are to give due deference to the fact finder's determinations. *Id.* at 8–9; *Clewis,* 922 S.W.2d at 136. Consequently, we may find the evidence factually insufficient only where necessary to prevent manifest injustice. *Johnson,* 23 S.W.3d at 9, 12; *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997).

### EVIDENCE PRESENTED IN THE ADJUDICATION PHASE

Appellant was accused of recklessly shooting and killing another juvenile with a nine millimeter handgun on September 2, 2000. B.S., Appellant's fifteen-year-old friend, was the first to testify at the trial. B.S. testified that on Friday, September 1, 2000, Appellant came home from school with him during lunch and B.S. showed Appellant his stepfather's nine millimeter handgun. The handgun was in his parents' bedroom and there was a clip in the gun and a box of bullets laying beside it. Appellant tried to pick up the gun, but B.S. did not allow him to touch it. B.S. testified that he had some informal training on firearm safety from his stepfather because he had gone hunting in the past. B.S. stated that his stepfather had taught him never to point a gun at anyone because it might go off, even if it was unloaded.

Next, the State called B.M., Appellant's sixteen-year-old friend. B.M. testified that Appellant pulled him into the bathroom at school on September 1, 2000, around 1:00 p.m., and showed him a nine millimeter handgun, bullets, and a clip Appellant had in his backpack. B.M. further testified that Appellant again showed him and another boy, K.D., the handgun at a park after the three got off of the school bus that afternoon. B.M. stated that he held the handgun and pulled back the slide and there were no bullets in the chamber. He stated he did not point the gun at anyone because he had been taught "you don't point [a gun] at anybody even if it's not loaded, because it could still be."

K.D. testified after B.M., reiterating the same story about seeing the handgun in the park. He testified that Appellant showed him and B.M. a box of bullets, then removed the handgun from his backpack and pulled out the clip of the gun and showed it to them. K.D. testified that the clip was "fully loaded" with bullets. Next, Jeremiah Carter, a nineteen-year-old, testified that Appellant attempted to sell him the handgun on September 2, 2000 at Carter's house. Carter asked to see the gun, but Appellant did not have it with him at that time.

After Carter, A.F., a sixteen-year-old girl who lived in Appellant's neighborhood, testified. A.F. stated that either the day of the shooting or the day before the shooting, Appellant pulled up his shirt and showed her the handgun in his waistband. A.F. further testified that, on the day of the shooting, she and her friend saw Appellant walk by with the victim, D.B., and another boy shortly before they heard a gunshot. A.F. and her friend went to the vacant house where the boys had been and saw D.B., who appeared to be dead, lying on the back porch.

The State next called L.R., A.F.'s friend that was with her the day D.B. was shot. L.R. reiterated the story A.F. told about hearing the gunshot and finding D.B. dead on the porch of the vacant house.

The State also called E.O., who was with D.B. and Appellant when D.B. was shot. E.O. testified that D.B. had come over to his house earlier that day and that Appellant called E.O. and told E.O. and D.B. to

meet him at the vacant house so he could show them something. E.O. and D.B. met Appellant on the back porch of the house and Appellant showed them the handgun, a clip loaded with bullets, and a box with bullets in it. E.O. testified that when he and D.B. came around the corner of the house to meet Appellant, Appellant had the gun pointing at them as if he was trying to scare them.

E.O. said Appellant kept loading and unloading the handgun, then he would point it at E.O. and D.B. with the clip out of the gun and pull the trigger. E.O. testified that he told Appellant to stop pointing the gun at him because he was afraid of getting shot. Appellant kept inserting and ejecting the clip into and from the gun. Appellant then pointed the gun at D.B. while the clip was out of the gun and pulled the trigger. D.B. told him to quit pointing the gun at him. Appellant inserted and ejected the clip again, pointed the gun at D.B., and pulled the trigger again. The gun went off and a bullet struck D.B. in the chest and killed him. D.B.'s mother testified that he was ten years old at the time of his death.

Two officers and one identification specialist with the Wichita Falls Police Department also testified. They explained that Appellant admitted to shooting D.B. and to throwing the gun into a stand of trees. Appellant told the first officer who interviewed him that he was shaking the gun and it went off. Officers recovered the gun, which had a clip in it containing three bullets, after Appellant pointed to where he had thrown the gun.

Aaron Fullerton, a firearms examiner, testified that he examined the handgun. He testified that the firearm had an 8 pound single action trigger pull and a 14.75 pound double action trigger pull. He explained that, because of the heavy trigger pull, it would take some effort for the average person to pull the trigger. Fullerton testified that all the components of the gun were working properly when he examined it. He also stated that the gun had one external safety and two internal safeties. He testified that the firearm would not fire unless the trigger was pulled, even if, as Appellant claimed, someone was shaking the gun.

### APPLICATION

Appellant argues in issues one and two that the evidence was legally and factually insufficient to support that he engaged in delinquent conduct by recklessly injuring a child because the evidence did not show he was reckless. The penal code provides that a person acts recklessly:

> when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c) (Vernon 1994).

■ The evidence showed that both E.O. and the victim, D.B., asked Appellant to stop pointing the gun at them and that Appellant continued to load and unload the clip with bullets in it, pull back the slide, point the gun at them, and pull the trigger. It was not until the fourth or fifth time, after both boys had asked Appellant to stop pointing the gun at them, that Appellant again pointed the gun at D.B., pulled the trigger, and the gun went off. We do not agree, therefore, with Appellant's assertion that the evidence showed he "took repeated actions he believed would prevent the gun from discharging." K.D. and B.M.'s testimony showed that the day be-

fore the fatal shooting, when Appellant showed the firearm to them in the park, Appellant knew how to check the chamber of the weapon for bullets. K.D. testified that when he first saw the gun, it was loaded with the clip in it, but Appellant removed the clip, pulled the slide back to check for cartridges, pointed the gun at the ground and pulled the trigger to be sure it was empty. Appellant did not take such precautions the next day when he accidentally shot D.B.

Moreover, the evidence refutes Appellant's initial claim that the gun went off because he was shaking it or because his hands were shaking. Fullerton testified that the trigger had at least an 8 pound pull and that the gun could not have gone off unless the trigger was pulled, even despite shaking. This evidence shows that Appellant had to have used some effort to purposefully pull the trigger. Furthermore, E.O. testified that Appellant pointed the gun at D.B. and, as E.O. glanced away, pulled the trigger and the gun fired at D.B. This evidence shows that Appellant pointed the weapon directly at D.B. and pulled the trigger. It does not show that the gun accidentally went off while Appellant was shaking it or holding it in his lap, as he claims. The fact that Appellant did not know there was a bullet in the chamber is the very reason he was charged with reckless injury to a child, rather than intentional injury to a child. This assertion, even if true, thus does not refute the evidence of Appellant's guilt.

In light of the evidence presented, we hold that a rational jury could have found the essential elements of the crime beyond a reasonable doubt and that the proof of guilt is not so obviously weak as to undermine confidence in the verdict. *See Johnson,* 23 S.W.3d at 8–9; *McDuff,* 939 S.W.2d at 614. Accordingly, we overrule Appellant's first two issues.

## STANDARD OF REVIEW IN THE DISPOSITION PHASE

In the disposition phase of a juvenile case where the trier of fact is a jury instead of a judge, the standard of review for a legal and factual insufficiency claim is unsettled in Texas law. We held in *In re J.S.* that appellate courts should apply the criminal standard of review rather than the civil no-evidence standard in reviewing the legal sufficiency of the evidence to support the adjudication of a juvenile offense. 35 S.W.3d 287, 292 (Tex.App.-Fort Worth 2001, no pet.). We so held based on the following reasoning:

> Given the fact that the State carries the same burden of proof in a juvenile proceeding as it does in an adult criminal case to show that the juvenile committed a penal offense and the quasi-criminal aspect inherent to juvenile proceedings, it seems more appropriate to apply the more stringent criminal standard of review to challenges to the legal sufficiency of the evidence to establish the commission of the offense in the adjudication phase.

*Id.* (citing *In re T.K.E.,* 5 S.W.3d 782, 784 (Tex.App.-San Antonio 1999, no pet.); *In re E.Q.,* 839 S.W.2d 144, 146 (Tex.App.-Austin 1992, no writ)).

In reviewing a disposition order in a juvenile case, however, some appellate courts, such as the San Antonio Court of Appeals, have declined to apply the criminal legal and factual sufficiency standards in reviewing disposition orders. *See T.K.E.,* 5 S.W.3d at 785; *see also In re A.S.,* 954 S.W.2d 855, 861 n. 3 (Tex.App.-El Paso 1997, no writ) (declining to apply the criminal standard of review because "the juvenile court's findings supporting the disposition order are not required to be supported by proof beyond a reasonable doubt."); *In re K.L.C.,* 972 S.W.2d 203, 206

(Tex.App.-Beaumont 1998, no writ) (applying a civil standard to a factual sufficiency review of family code section 54.04 findings in the disposition phase).

In *T.K.E.*, the court applied the civil standard of review because it "supports the discretion the juvenile court has been given to make [its] findings ... [and] is consistent with the procedural requirements of the family code." *T.K.E.*, 5 S.W.3d at 785 (citing TEX. FAM.CODE ANN. § 51.17 (Vernon 1996) (stating that juvenile proceedings are governed by the rules of civil procedure in the absence of a contrary family code provision); TEX. FAM. CODE ANN. § 56.01(b) (stating that the requirements governing an appeal are as in civil cases generally)).

In *J.S.*, we determined that the criminal standard was applicable because we were reviewing the *adjudication* phase in which the State's burden was the criminal standard of beyond a reasonable doubt. 35 S.W.3d at 292. We have not been presented with the issue of what standard is applicable in the legal and factual sufficiency review of an order issued during the disposition phase of a juvenile trial. When faced with this novel question, we tend to agree with the court in *T.K.E.*, which stated, "The Family Code places no burden of proof on the State at the disposition phase of a juvenile proceeding. Accordingly, the logic enabling the application of a criminal standard during the review of the adjudication phase does not apply in the review of the disposition phase." 5 S.W.3d at 785.

▄▄▄ Accordingly, in reviewing Appellant's sufficiency challenge to the evidence supporting his disposition we review the evidence under the civil standard. In reviewing the legal sufficiency, we therefore consider only the evidence and inferences tending to support the findings under attack and set aside the judgment only if there is no evidence of probative force to support the findings. *Id.; see A.S.*, 954 S.W.2d at 858; *In re S.A.M.*, 933 S.W.2d 744, 745 (Tex.App.-San Antonio 1996, no writ). In reviewing Appellant's factual sufficiency claim, we consider and weigh all the evidence and set aside the judgment only if the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *T.K.E.*, 5 S.W.3d at 785; *see K.L.C.*, 972 S.W.2d at 206; *A.S.*, 954 S.W.2d at 862.

▄▄▄ A juvenile court has broad discretion in determining a suitable disposition for a juvenile who has been adjudged to have engaged in delinquent conduct. *See In re T.A.F.*, 977 S.W.2d 386, 387 (Tex.App.-San Antonio 1998, no pet.); *In re J.R.*, 907 S.W.2d 107, 110 (Tex.App.-Austin 1995, no writ). We, as a reviewing court, will thus not disturb the juvenile court's findings regarding disposition absent a clear abuse of discretion. *See T.A.F.*, 977 S.W.2d at 387; *In re C.C.*, 930 S.W.2d 929, 933 (Tex.App.-Austin 1996, no writ).

If the court commits a juvenile to TYC, the court must find and include in its disposition order its determination that:

(A) it is in the child's best interests to be placed outside the child's home;

(B) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home; and

(C) the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation.

TEX. FAM.CODE ANN. § 54.04(i)(1) (Vernon Supp.2002).

In this case, the trial court included the required statutory language in its order of disposition. However, Appellant contends

in issues three and four that the evidence is both legally and factually insufficient to support any of the section 54.04(i) findings and that, therefore, the trial court abused its discretion in committing him to TYC.

### EVIDENCE PRESENTED IN THE DISPOSITION PHASE

Chris Fletcher, a licensed professional counselor at an adolescent day treatment facility called Rose Street School, testified that he had been treating Appellant since 1999. The Rose Street School, Fletcher testified, is designed to handle children like Appellant who cannot function in public schools. Appellant, however, continued refusing to complete his school work, being defiant, not participating in group sessions, and exhibiting other negative behaviors, which prompted the staff at the Rose Street School to discharge him from the school. Fletcher testified that Appellant was depressed, but was also manipulative, and would fake suicide attempts to get out of the room where he was being detained while awaiting trial. Fletcher stated that Appellant had become more and more involved with gangs during the time he had been counseling Appellant, and that, most recently, Appellant carved some numbers that are affiliated with one of the gangs in the area into his arm.

Fletcher further testified that he had tried different techniques with Appellant and that nothing seemed to change Appellant's poor behavior or cause Appellant to understand the consequences of his actions. Fletcher's opinion was that further therapy would be of little or no benefit to Appellant. Fletcher stated that he did not think, if Appellant were given probation, he could successfully complete it. He based this opinion on his belief that Appellant's parents, though Fletcher had counseled with them about various disciplinary techniques, had difficulty being consistent

with Appellant and on the fact that Appellant, despite all the therapy, hospitalization, and detention he had been through in the past, continued to engage in the same negative behaviors.

On cross-examination, Fletcher was questioned extensively about Appellant's psychiatric condition, Attention Deficit Hyper–Activity Disorder (ADHD), and concurred that the symptoms included an inability to make good decisions, impulsive behavior, and the inability to focus and concentrate on instructions. Fletcher also agreed that Appellant had suffered from flashbacks and nightmares stemming from the shooting and that Appellant had expressed remorse, regret, and sorrow about shooting D.B. Another doctor had in fact diagnosed Appellant with acute stress disorder, which is a less-severe form of post-traumatic stress disorder, associated with the shooting. Fletcher stated more than once, however, that despite Appellant's mental health issues, he is able to make conscious decisions to do what he is told and to act like he should, which, if he did so, would lessen the extent of some of his problems.

Next, Sharon "Sonnie" Wilson, Appellant's probation officer, testified that Appellant was initially referred for probation after he was arrested and adjudicated for criminal trespass. As part of his probation, Appellant was not to associate with certain people, including E.O., who was the other boy with Appellant when D.B. was shot. Wilson testified that Appellant had some problems while on probation because he would fail to attend classes at school, come in after his set curfew, and would get into trouble at school and have to be placed in on-campus suspension. Appellant also tested positive for marijuana. Appellant told Wilson he had been "jumped in," or initiated, into a gang when he was in eighth grade. Wilson testified

that Appellant had carved the number "107" into his arm, which represented a local gang that is one of the "Crip sect," and that Appellant admitted to her that several of his friends were gang members. Wilson also recounted at least three instances wherein Appellant lied to manipulate people, to avoid the consequences of his behavior, or to get his way. Wilson recommended that Appellant be given a determinate sentence in TYC because of the structure that the TYC program provides, the resocialization skills that Appellant would be taught in TYC, and the increased counseling services Appellant would be provided. Wilson also testified that Appellant admitted to her that he had been using marijuana on a daily basis for nearly a year. Wilson stated that Appellant's mother had "maxed out her capabilities" in dealing with Appellant and that there was not much else she could do to make the situation better.

Johnny Roberts, the casework supervisor for the Wichita County Juvenile Probation Department, testified that he had reviewed the department's recommendation that Appellant be placed in TYC and agreed with it. Roberts stated this was because Appellant had been on probation in his home and "he's proven to not be compliant with [it] . . . and it's not been a deterrent to his delinquent activity." Roberts also opined that options other than placing Appellant in TYC, such as putting Appellant on probation while committing him to a treatment facility, were not appropriate because, "[w]e have never in the history that I've worked for the department looked for and considered continuing a child on probation after they take the life of another individual."

Appellant's mother testified that she did not think Appellant should be placed in TYC because of the limited availability of care and treatment for his mental disorders. Instead, she testified that Appellant should be placed in a treatment facility. She admitted, however, that it would probably be difficult to find a facility that would accept Appellant. Roberts agreed that it would be difficult to place Appellant because of his mental problems and the violent nature of his adjudication. Roberts noted that Appellant would not be discharged from TYC until he worked through the resocialization program with some success, whereas, in a treatment facility, he might not be held to a certain level of performance.

A psychiatrist, Dr. Harvey Martin, testified that correctional therapy of the type Appellant would receive at TYC was just the type of therapy Appellant needed. Dr. Martin concurred with the other witnesses in stating that Appellant needs a secure, controlled environment with structure and immediate punishment for bad behavior. Dr. Martin stated that the violent offender program, to which Appellant would be admitted because of the nature of his adjudication, was nationally recognized and provides optimum victim empathy treatment for the offender. The program is also designed to help juvenile offenders identify the risk factors in which they were engaging at the time of the offense to train them to avoid such situations in the future.

## APPLICATION

Appellant argues that he should not be placed in TYC because he could be further harmed by being confined with known gang members and violent offenders and because there are less severe alternatives available. Although Appellant might be exposed to gang members while in TYC, the evidence suggests that he already consorts with gang members, or, at the very least, aspires to do so. Therefore, it does not appear that placing him in TYC would pose a much greater risk, if any, than

allowing him to remain on probation or placing him in a treatment facility.

It is also clear from the record that probation, medication, alternative schools, years of weekly counseling sessions, and other types of intervention have been attempted and have had little or no effect on Appellant's behavior. Despite that Appellant clearly has psychiatric disorders and behavioral problems, this does not render obsolete the jury's finding, based on testimony from professionals who have worked with Appellant for several years, that he should be placed in TYC. Roberts clearly stated that he did not feel alternatives such as more intensified probation or confinement in a treatment facility would be appropriate for Appellant. All of the professionals agreed that Appellant needs to understand that he is accountable for his actions, and that placing him in TYC could help Appellant in such a regard.

■ In light of this information from the record, we do not agree with Appellant that there is a lack of evidence of probative force to support the jury's finding. Nor do we agree that the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. We overrule Appellant's third and fourth issues.

### CONCLUSION

Having overruled each of Appellant's issues, we affirm the trial court's judgment.