

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00226-CV

IN THE MATTER OF K.L.

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-104786-17

----------

## MEMORANDUM OPINION[1]

----------

K.L. appeals from the trial court's orders adjudicating him delinquent and committing him to the custody of the Texas Juvenile Justice Department (TJJD). As grounds for relief, K.L. contends that the State failed to disprove his self-defense claim and that the trial court's decision to commit him to TJJD was arbitrary and unreasonable. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## I.      Procedural Background

On April 9, 2017, sixteen-year-old K.L. and his older brother Darren got into a verbal and physical altercation at the duplex they shared with their mother Anne[2] and two younger sisters. The fight started while Darren was looking for his work jacket and started going through K.L.'s belongings. Anne called 911 twice while K.L. and Darren were fighting. After the Fort Worth police arrived at the home and interviewed K.L., Darren, and Anne, they arrested K.L. for aggravated assault and issued Darren a citation for Class C misdemeanor assault. The State then filed a petition accusing K.L. of engaging in delinquent conduct by intentionally or knowingly threatening his brother with imminent bodily injury while using or exhibiting a knife. *See* Tex. Fam. Code Ann. § 51.03(a)(1) (West Supp. 2017); Tex. Penal Code Ann. § 22.01(a)(2) (West Supp. 2017), § 22.02(a)(2) (West 2011). The trial court ordered K.L. detained in the Tarrant County Juvenile Detention Center.

K.L. signed a waiver of the right to jury trial. *See* Tex. Fam. Code Ann. §§ 51.09, 54.03(c) (West 2014). After the adjudication hearing, the trial court[3] found that K.L. had engaged in delinquent conduct by committing the

---

[2]We use pseudonyms to refer to K.L.'s brother and mother. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2017); Tex. R. App. P. 9.8(c)(2).

[3]K.L. signed a written waiver of his right to have the district judge preside over his hearings; one of the associate judges assigned to the court presided over both the adjudication and disposition hearings. *See* Tex. Fam. Code Ann. § 54.10(a) (West Supp. 2017).

offense of aggravated assault with a deadly weapon. *See id.* §§ 51.03(a)(1), 54.03. After the disposition hearing, the trial court ordered K.L. committed to TJJD custody for an indeterminate sentence. *Id.* § 54.04 (West Supp. 2017).

## II. Sufficiency of Evidence–Adjudication

K.L. first argues that the State failed to disprove his self-defense claim beyond a reasonable doubt.

## A. Standard of Review

For criminal convictions, federal due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. We apply the due-process standard of review applicable to criminal convictions to delinquency adjudications. Tex. Fam. Code Ann. § 54.03(f); *In re J.D.P.*, 85 S.W.3d 420, 422 (Tex. App.—Fort Worth 2002, no pet.). According to that due-process standard of review, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). The trier of fact is the sole judge of the weight and credibility of the evidence and may draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599; *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016); *see* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979). We determine whether inferences are

reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).

We employ the same standard of review when the appellant raised a nonaffirmative statutory defense at trial. At trial, once a defendant has introduced some evidence supporting a defense under section 2.03 of the penal code, the State bears the burden of persuasion to disprove it. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Kirk v. State*, 421 S.W.3d 772, 777 (Tex. App.—Fort Worth 2014, pet. ref'd). This burden requires the State to prove its case beyond a reasonable doubt; it does not require the State to introduce evidence disproving the defense. *Zuliani*, 97 S.W.3d at 594. Thus, to determine if the State brought forward sufficient evidence to disprove a nonaffirmative defense such as self-defense, we ask "whether[,] after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact [1] would have found the essential elements of [the offense] beyond a reasonable doubt and [2] also would have found against appellant on the [defensive] issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see also Smith v. State*, 355 S.W.3d 138, 144–47 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). K.L. admits that he committed the essential elements of aggravated assault with a deadly weapon, but he challenges the sufficiency of the evidence to support the trial court's rejection of his self-defense claim.

**B.      Applicable Law**

A person commits aggravated assault if he intentionally or knowingly threatens another with imminent bodily injury and uses or exhibits a deadly weapon while doing so. Tex. Penal Code Ann. §§ 22.01(a)(2), 22.02 (a)(2). But a person is justified in using force against another when and to the degree he reasonably believes the force is necessary to protect himself against the other's use or attempted use of unlawful force. *Id.* § 9.31(a) (West 2011). The person may also use deadly force against another when, among other things, he reasonably believes the deadly force is immediately necessary to protect against the other's use of unlawful deadly force. *Id.* §§ 9.31(d), 9.32(a)(2) (West 2011). The penal code defines "[d]eadly force" as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3) (West 2011). But "a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force." *Id.* § 9.04 (West 2011).

**C.      911 Recordings and Statements to Officers**

The State played the recordings of both of Anne's 911 calls for the trial judge. We cannot discern much of what Anne is saying on the recordings, but in the first recording, we can clearly hear her telling the 911 operator that "they" were about to beat each other up. When the operator asked Anne to identify who

5

was fighting, she identified both K.L. and Darren by name. When the operator asked her if either of the two had a weapon, Anne said, "One has a knife." Although there is little background noise in the beginning of the recording, as it progresses, we can hear males yelling in the background. Anne yelled more than once, "You['re] going to jail!" We can hear more yelling in the background of the second recording, laced with copious profanity. Anne again told the operator that "one of them" had a knife. When the operator asked if someone was threatening another person with the knife, Anne answered, "Yes."

When Fort Worth police officer Josh Ward arrived at the home, he first spoke with K.L., who appeared agitated. Ward talked to K.L. in the front yard for a few minutes and then took K.L. to his vehicle where K.L. calmed down. K.L. told Ward "he had gone after [Darren] with a knife" and that he got the knife after throwing a shoe outside "because he was tired of his brother hitting on him." K.L. did not explain to Ward in detail what he did with the knife. K.L. also admitted to Ward that he had knocked down the front door. When asked if Darren pulled a knife on K.L., Ward testified that "there was a mention of a hair pick or something that . . . [Darren] had." But Ward also said he would not characterize a hair pick as a deadly weapon.

Another Fort Worth police officer, Daniel Pritzker, took written statements from Anne and Darren, as well as a recorded interview, and gathered evidence, including pictures of the broken front door frame and two knives. According to

6

Pritzker, Anne and Darren identified the knives Pritzker collected as the ones K.L. used that day.

The trial court admitted the recorded interview and written statement into evidence. In the recording, Anne told Pritzker that K.L. threw Darren's phone outside while the brothers were inside the house fighting. While Darren was outside picking up the phone, K.L. came outside with a knife; Anne demonstrated to Pritzker a back-and-forth-stabbing motion. She also said that when Darren was holding K.L.'s arms back, K.L. tried to stab him with the other knife. Without going into much detail, Darren told Pritzker that K.L. first pulled one knife and then another on him.

According to Darren's written statement, when he started going through K.L.'s things looking for his jacket, K.L.

> got mad . . . , then started fighting on me, so I fought back. As I fought back, he threw my phone outside, which escalated the situation. So I came in, fo[u]ght him again and threw his shoe outside. When I did that, I locked the door so he kicked it in, and pulled a long knife on me saying "fuck you, I'll kill you." So that started another argument. Then he grabbed my shoe trying to cut it up as I tried to stop him, he tried to stab me with another knife. Then when I stopped him, the police showed up.

Pritzker testified that based on his training and experience, the way K.L. used the knives that day could be deadly. Although Pritzker agreed that he saw evidence of self-defense based on the broken door frame and items that were strewn around the home, he did not believe that K.L. had acted in self-defense that day.

7

**D.    Family's Testimony at Trial**

**1.    Darren**

Darren testified that in the afternoon on April 9, 2017, he was getting ready for work and asked if K.L. had his work jacket. Although K.L. denied knowing where the jacket was, Darren went through K.L.'s clothes and other belongings looking for it. The brothers began to argue, which led to a physical altercation.

K.L. told Darren, "Quit going through my stuff," but Darren kept searching through K.L.'s belongings. K.L. stepped "close to" Darren's face, and Darren pushed him twice. After K.L. pushed Darren back, Darren "swung on" K.L., and the two started fighting.

At some point, K.L. grabbed a butcher knife that was on the kitchen table and according to Darren, "was like, Hey back up." K.L. had the knife in his hand for about three seconds but did not chase Darren with it; he just stood in one spot, and Darren backed up. Darren described K.L.'s actions in more detail:

Q. And did you -- did you tell the officers that he chased you with the knife?

A. No. He didn't chase me with it. He was just standing in one spot.

Q. Well, you listened to what you just said --

A. Uh-huh.

Q. -- in the 911 recording -- or --

A. Yeah.

Q. -- the body cam, right?

8

A. Yeah, because I was outside, I was trying to get my phone, and after I saw him coming towards me, you know what I'm saying, I just saw -- I saw a knife in his hand, and that was it.

Q. How long did he have the knife in his hand?

A. For, like, three seconds.

Q. Is that the only time he held a knife in his hand?

A. The only time, like -- yeah. And then the second time he wasn't, like, coming at me with it. He was trying to cut my shoes because I had threw his shoes outside. So I guess he got mad so he just trying to cut my shoes.

Darren testified that K.L. did not have a knife with him when he kicked in the front door. He denied that K.L. had tried to stab him despite what he had said in his written statement. He also denied that K.L. had threatened to kill him and said that he made up what he had told Pritzker because Anne had wanted K.L. out of the house. According to Darren, Ward and Pritzker told him they could not take K.L. away unless Darren said K.L. had done "certain things," so Anne said, "Say that, say that." Darren tried to have the charges against K.L. dropped the following week.

**2.    Anne**

Anne testified that she had been sleeping but woke up when she heard Darren and K.L. fighting. When she came out of her room, K.L. was sitting on the couch and Darren was looking through the closet for his jacket. Sometime after that, K.L. threw Darren's cell phone out the front door, breaking it. Anne and Daren both went outside to look for the phone, leaving K.L. inside. According to

9

Anne, while she and Darren were looking for the phone, she called 911 to report that the two had been fighting. K.L. came to the open front door, threw a shoe outside, and shut the door.

Anne further testified that Darren climbed in the window. After that, she opened the front door and saw that K.L. had picked up the butcher knife; he and Darren were "trying to go outside and fight." According to Anne, K.L. was "[g]oing toward" Darren with the knife in his hand, but "[h]e didn't aim it at him." K.L. put the knife down, but the two started arguing again and throwing each other's belongings outside.

K.L. went outside, and Darren shut and locked the front door. K.L. then broke the door open, went into Darren's closet and grabbed a shoe, and then grabbed a "little-bitty knife" and tried to cut the shoe up. Darren held K.L.'s arms down so he "wouldn't do nothing with it." The police arrived "right after" K.L. put the second knife down. Anne did not think she told the officers she saw K.L. cutting Darren's shoe and denied being able to see what K.L. was doing with the small knife.

Anne testified that she was angry and tired of "all the arguing and fighting all the time," and she wanted K.L. to leave the house, but only "to cool off [and] come back."

### 3.    K.L.

K.L. testified that the fight started in the living room and ended up in the kitchen. K.L. described what happened in the kitchen: "Basically, he was hitting

on me, punching me in my face and stuff, you know, hitting me in my jaw and my lips and all that. So I felt like I was going to get knocked out or something, so I just grabbed a knife in self-defense." According to K.L., he had picked up only one knife, the "little" one, and he only "held it." Darren was standing behind him. K.L. demonstrated how he was holding the knife, but the record does not reflect K.L.'s physical actions in the courtroom. K.L. testified that he told Darren, "Get off me," and Darren did. According to K.L., at that point he walked over to Darren's shoe and tried to cut it. Darren grabbed the shoe and K.L. threw the knife on the ground; Darren responded by throwing K.L.'s shoe outside and then locking the door when K.L. went outside to get it. K.L. forced his way in the house because he was afraid Darren was going to "do something to [his] stuff or . . . hide [his] phone." When he got inside, the two only argued until the police arrived. K.L. denied grabbing a knife again after coming inside.

K.L. said he was holding the knife while Darren was hitting him from behind because he "couldn't see him." He denied that Darren had hit him with a knife or displayed a weapon of any kind. Nevertheless, K.L. felt as if Darren was winning the fight, that he could not defend himself, and that he was about to get knocked out if Darren kept hitting him. He said he held the knife for only about seven seconds, including while he was trying to cut Darren's shoe. K.L. denied waving the knife or threatening to kill Darren with it. He felt like he was getting picked on that day. According to K.L., Ward was lying when he testified that K.L. admitted getting the knife to "go after" Darren with it.

11

**E.      Analysis**

The trial judge was faced with conflicting versions of events: each family member's contemporaneous statements to the police and the testimony of each family member at trial. As the fact finder, the trial judge could have believed that the version of the events the family told the police officers on the day of the fight was more credible. According to that version of events, K.L. pulled the large knife on Darren after breaking down the door to the home, threatened to kill him, moved the knife toward Darren in a stabbing motion, and later tried to stab Darren with a smaller knife after Darren restrained K.L. as he was trying to cut Darren's shoe. Not only does this version of events contradict the trial testimony that K.L. merely held the larger knife in his hand and only tried to cut Darren's shoe with the small knife, it also shows that K.L.'s use of both knives was not in response to Darren's hitting him. Therefore, we hold that the evidence is sufficient to support (1) the trial court's determination that K.L. engaged in delinquent conduct by committing aggravated assault with a deadly weapon and (2) the trial court's concurrent rejection of K.L.'s self-defense claim. We overrule K.L.'s first complaint.

### III.      Disposition Order Not Arbitrary and Unreasonable

In his second complaint, K.L. argues that the trial court's decision to commit him to TJJD custody, instead of to a placement for psychological treatment, was arbitrary and unreasonable in light of the legislative purposes underlying the Juvenile Justice Code. According to K.L., committing him to TJJD

12

does not promote his welfare or the public's safety and "verges on cruel and unusual punishment."

## A.    Standard of Review

A juvenile court has broad discretion in determining a suitable disposition for a juvenile who has been adjudged to have engaged in delinquent conduct. *See J.D.P.*, 85 S.W.3d at 426. Thus, we will not disturb the juvenile court's findings regarding disposition absent a clear abuse of discretion. *See id.* To determine whether a trial court has abused its discretion, we must decide whether it acted without reference to any guiding rules or principles; in other words, whether its act was arbitrary or unreasonable. *See In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). "Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id.* (citations omitted).

A trial court is not required to exhaust all possible alternatives before committing a juvenile to TJJD custody. *Matter of D.P.*, No. 02-15-00181-CV, 2016 WL 7405796, at *3 (Tex. App.—Fort Worth Dec. 22, 2016, no pet.) (mem. op.); *In re A.K.A.*, No. 04-13-00666-CV, 2014 WL 2601731, at *3 (Tex. App.—San Antonio June 11, 2014, no pet.) (mem. op.); *In re J.R.C.*, 236 S.W.3d 870, 875 (Tex. App.—Texarkana Oct. 11, 2007, no pet.). Thus, in reviewing the propriety of the trial court's disposition, we do not focus on whether a placement

13

for psychological counseling would have been a better choice for K.L. than commitment to TJJD; instead, we consider whether sufficient evidence supports the trial court's decision to commit K.L. to TJJD custody.[4] *D.P.*, 2016 WL 7405796, at *3.

We apply the civil standard of review to challenges to the sufficiency of the evidence to support a disposition. *Id.* at *1; *J.D.P.*, 85 S.W.3d at 426. When determining whether legally sufficient evidence supports a finding under review, we consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *D.P.*, 2016 WL 7405796, at *1; *In re M.E.*, No. 02-14-00051-CV, 2014 WL 7334990, at *2 (Tex. App.—Fort Worth Dec. 23, 2014, no pet.) (mem. op.). Anything more than a scintilla of evidence supporting a finding renders the evidence legally sufficient. *D.P.*, 2016 WL 7405796, at *1; *M.E.*, 2014 WL 7334990, at *2. When reviewing whether the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing

---

[4]K.L. relies on an opinion urging that in an appropriate case, a court of appeals should employ a standard of review that considers only the legal question of whether the trial court's disposition order conforms to the purposes of juvenile law as expressed in the family code. *See In re K.T.*, 107 S.W.3d 65, 74 (Tex. App.—San Antonio 2003, no pet.) (citing Tex. Fam. Code Ann. § 51.01 (West 2014)). But not only has the San Antonio court of appeals disapproved of the standard of review articulated in that opinion, *Matter of E.K.G.*, 487 S.W.3d 670, 676 (Tex. App.—San Antonio 2016, no pet.), principles of statutory interpretation dictate that the required legislative findings that would permit a TJJD commitment order are in conformity with the legislative purposes underlying the Juvenile Justice Code, *see* Tex. Gov't Code Ann. § 311.021(2) (West 2013).

all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *D.P.*, 2016 WL 7405796, at *2; *M.E.*, 2014 WL 7334990, at *2.

## B.      Probation Officer's Report

At the disposition hearing, the trial judge read from a report prepared by the probation department—and admitted into evidence—that detailed K.L.'s prior referrals to the juvenile court beginning when he was twelve:

> Your previous history is extensive. You've been referred a number of times beginning in December of '13. It was an assault with bodily injury case that was not filed. March of 2014, assault on a public servant. You were given probation at that time for the first time April the 4th of 2014.
>
> A couple of months later there was another referral for theft from [a] person. You were allowed another opportunity of probation at that time. That was in early July of 2014. And the probation that you were on also was extended at that time.
>
> Later that year in September there was an assault with bodily injury that was not filed. In October '14, a violation of court order. March 15 -- March 2015, another violation of a court order. July 1st of 2015, aggravated assault with a deadly weapon and two more violations of court order. None of those cases were brought before the Court. August 27th of 2015, assault on a family member, which was dropped by the complainant.
>
> September of 2015, resisting arrest and possession of prohibited weapon, that being a switchblade or knuckles in a weapons free zone. You were adjudicated a third time, I believe, and given a third opportunity of probation.

15

There were additional violations of court orders that were not filed, and then you have this adjudication.

*See* Tex. Fam. Code Ann. § 54.04(b) (providing that trial court may consider written reports from probation officers or professional consultants in disposition hearing).

The report also discusses K.L.'s family history, including his parents' separation and his strained relationship with his father. K.L. is close with his maternal grandmother. K.L. was primarily responsible for caring for his younger sisters at night while Anne worked until 2:00 a.m. K.L. and Darren "got into it" at least once a week; although their altercations were not always physical, K.L. reported that "most of the time they argue until [Darren] puts his hands on" him. According to Anne, K.L. and Darren argue over petty things; it "always turns physical" and they tear up the house. K.L. is usually the aggressor, gets angry easily, cusses at her, and is aggressive with his sisters. K.L. has assaulted Anne twice. She described him as uncontrollable when angry.

Anne described the dynamic between K.L. and Darren as follows:

[E]very time he and [Darren] get into [a fight], [K.L.] gets a knife. [K.L.] will threaten . . . to stab [Darren] and says he wants [Darren] dead. [Anne] said [K.L.] has tried to stab [Darren] before and [she] tries to intervene. [K.L.] then turns on [her] when she tries to stop it. This time he turned to [Anne] and told her he wants her dead as well. [Anne] said she calls the cops when [K.L.] gets a knife but this is the first time the police arrested [K.L.] over it. [Anne] said [K.L.] pulls out a knife at least 2-3x a month. [Anne] said she tries to keep the knives hidden but she does a lot of cooking and catering so they are where she can access them when she needs them.

16

Anne reported that K.L. has been aggressive since third grade, had been "very disturbed," and would throw chairs in school and fight with teachers. K.L. has been suspended twenty times since elementary school for "cussing, getting loud, fighting, and being in possession of brass knuckles." In middle school, staff would have to restrain him often; he has "put his hands on" teachers and destroyed property. K.L. is not allowed to enroll in at least two Fort Worth public high schools. He is a year behind in school. Although K.L. told the probation officer he regularly attended school, his mother reported that he may stay home and "do nothing" one or two days a week if he does not feel like going to school.

K.L. started going to MHMR in sixth grade but refused to take prescribed medication. Anne believed he needed counseling; she had tried to get him help, but he refused to listen to anyone, even his probation officer. Anne described her relationship with K.L. as good until he was unable to get his own way.

K.L. reported that he had started smoking marijuana at age twelve and that he smokes three times a week to "calm . . . down and stay calm." A psychologist diagnosed him with severe cannabis use disorder after K.L. reported that he had smoked marijuana nearly every day since he was twelve.

The probation officer's report also detailed all of the services—twelve— that had been offered to K.L. He completed ten and failed to comply with two. The report concluded that "[a] community plan is not recommended at this time due to [K.L.'s] history of aggression, noncompliance with previous community services offered; lack of motivation for change; and lack of parenting skills in the

17

home." The probation officer determined that K.L. had a high risk of reoffending and that K.L. would benefit from additional supervision by the probation department. K.L. had four incident reports while in detention awaiting his adjudication hearing; three involved physical aggression against staff and one involved threatening a peer.

An associate judge performed a placement search and found an outside placement that would accept K.L. However, the report also noted that "Parent(s)/guardian(s) have indicated that they can provide suitable supervision if the child is allowed to return home." During the intake interview with the probation officer, Anne had expressed that she wanted K.L. placed outside the home, but she changed her mind after family mediation and wanted K.L. to come back home. K.L.'s maternal grandmother offered to let him live with her. K.L. reported that he wanted to "work on the way he handles situations and the way he reacts."

A staffing resource form attached to the probation officer's report notes that K.L. had reported seeing his father physically abuse Anne, that CPS had found reason to believe that K.L.'s parents had physically abused him when he was eight years old, and that CPS had investigated allegations that Anne and their grandmother had neglectfully supervised K.L. and his siblings.

In an email to the probation officer from an MHMR chemical dependency counselor dated April 18, 2017, the counselor opined that K.L. "could benefit from a least restrictive setting of care to assess if he can achieve, and remain in

18

recovery while residing within his primary living environment." But the counselor also noted that K.L. reported Anne does not have a problem with K.L. smoking marijuana when he is not around his sisters.

A psychological evaluation notes that K.L. "expressed a seemingly genuine lack of empathy for those he ha[d] harmed in his many altercations, and he indicated that he has simply accepted himself as he is." K.L. admitted being inebriated at school and told the psychologist that he was not motivated to participate in mental health treatment because it had been a substantial waste of time. K.L. told the psychologist that on several occasions he had needed to reside with his grandmother to avoid trouble with the apartment complex where he lived with Anne and his siblings. K.L. denied a history of physical or sexual abuse, but the counselor noted that K.L.'s attachment to Anne and his siblings seemed "ambivalent."

The psychologist made the following recommendation:

[H]is relative immaturity, low motivation, and explosive anger combine to form a poor prognosis given a natural course or short-term intervention. Thus, it is recommended that [K.L.] be considered for placement in a long-term and secure residential treatment program where he might achieve a lasting sobriety and receive the strict supervision and comprehensive treatment that his needs require. It is also possible that [K.L.] might benefit from exposure to a strict behavioral program that reinforces prosocial attitudes in community living. Without successful intervention, [K.L.] is at a high risk for recidivistic behaviors, including acts of violence, and further development of his addiction as he matures into adulthood.

## C. Disposition Hearing Testimony

K.L. agreed that he had a problem with anger management despite being in counseling. He admitted to using marijuana in the past. K.L. also admitted having aggression issues while in detention because of his frustration with being there.

Anne testified that she wanted K.L. to be placed on probation and to come home; she thought being in detention for two months had changed him for the better. The family had attended mediation, which went well. Anne admitted that she had dropped prior assault charges against K.L. But she explained that on at least one of those occasions, they were "just tussling, and [K.L.] refused to stop when the officer wanted him to stop."

## D. Trial Judge's Comments and Findings

In concluding remarks, the trial judge stated,

> You have been provided a great number of services in the community during your prior three terms of probation. I'm concerned that you're here again for another felony offense, and I am concerned . . . with the kinds of offenses that you've been referred for before. And I know you know you have an issue, and I don't think that simply spending this time in detention is the way you learned a lesson about how to change that kind of behavior. You need some serious help with that, so I don't intend to send you home today on probation.

> I do need to think about whether or not I'm going to order that you be placed or commit you to TJJD. There is an option for you to be placed, I understand, and I want to consider that before I make this decision. But I am concerned that while you've been here you have engaged in some aggressive activity, as well, and that's happened while you've been in detention, and my concern is

whether or not you're going to continue that kind of behavior if I give you the opportunity of placement.

The purpose of placement would be for you to learn the skills to change your behavior so you don't end up severely hurting someone and ending up spending the majority of your life in prison. That is not what you need to do . . .

You have the potential to do much better than that, but if you continue with this kind of behavior, that is a future that I'm afraid you face.

The trial court's disposition order contains the following relevant findings:

[T]he child is in need of rehabilitation and . . . the protection of the public and the child requires that disposition be made. The Court also finds that the said child at the time of this hearing was 16 years of age . . . .

The Court finds it is in the child's best interests to be placed outside the child's home. The Court also finds that reasonable efforts were made to prevent or eliminate the need for the child's removal from the child's home and to make it possible for the child to return home and the child, in the child's home[,] cannot be provided the quality of care and level of support and supervision that the child needs to meet the condition of probation.

. . . .

It further appears to the Court that the best interest of the child and the best interest of society will be served by committing him to the care, custody and control of [TJJD], for the following reasons:

1) There are no facilities, services or programs available which would meet the needs of the child;

2) The Court finds that the educational needs of the child can be met by [TJJD];

3) The child has been found by the COURT to have violated Section 22.02 (FEL) of the Texas Penal Code, on or about APRIL 9, 2017 and was adjudicated delinquent on JUNE 6, 2017.

4) The child has been previously adjudicated delinquent for [three prior felony] offenses . . . .

## E.    Analysis

The family code prohibits a trial court from making a disposition "unless the child is in need of rehabilitation or the protection of the public or the child requires that disposition be made." Tex. Fam. Code Ann. § 54.04(c). Here, the trial court found that K.L. needed to be rehabilitated and that both K.L.'s and the public's needs required a disposition. K.L. does not challenge these findings. At the time K.L. committed the offense, the family code further provided that if a grand jury had not approved the petition for adjudication (which it did not here), the trial court could commit a child to TJJD without a determinate sentence if it made a finding at the adjudication hearing that the child had engaged in delinquent conduct that violated a felony-grade penal code provision. Act of May 24, 2013, 83rd Leg., R.S., ch. 1323, § 2, 2013 Tex. Sess. L. Serv. 3507, 3507 (amended by Act of May 31, 2015, 84th Leg., ch. 962, §§ 1, 8, 2015 Tex. Sess. L. Serv. 3403, 3403, 3407, effective for conduct occurring on or after September 1, 2017) (current version at Tex. Fam. Code Ann. § 54.04(d)(2)). Aggravated assault with a deadly weapon is a felony offense. Tex. Penal Code Ann. § 22.02(b).

To commit K.L. to TJJD for an indeterminate sentence, the trial court was further required to find that

> (A) it is in the child's best interests to be placed outside the child's home;

22

(B) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home; and

(C) the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation. . . .

Tex. Fam. Code Ann. § 54.04(i). K.L. appears to be challenging the sufficiency of the evidence to support these findings.

The evidence shows that K.L. had a long history of violent behavior, had been adjudicated delinquent for several felonies, had been placed on probation at least twice, and was uncontrollable at home. His probation officer determined he was at high risk for reoffending. He was prone to threaten Darren with knives when violent, and although there is no evidence that K.L. had been violent with his younger sisters, he was primarily responsible for their care until late at night. K.L. had been offered numerous services, but he would not take advantage of all of them, and he was resistant to counseling. The probation officer and a counselor determined that K.L. would benefit not only from comprehensive treatment but also the strict supervision that he did not have at home. Anne and K.L.'s grandmother had a CPS history involving K.L. and his siblings. And K.L. continued to act out even after being placed in detention for this offense. Finally, the trial judge expressed a desire to provide the type of intervention that would help prevent K.L. from committing a future crime that would subject him to the adult correctional system.

23

We hold that this evidence is both legally and factually sufficient to support the trial court's disposition order, and we overrule K.L.'s second complaint.

## IV.    Conclusion

We affirm the trial court's orders.

/s/ Wade Birdwell
WADE BIRDWELL
JUSTICE

PANEL:  MEIER, GABRIEL, and BIRDWELL, JJ.

DELIVERED:  April 12, 2018

24