

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00230-CV
No. 02-18-00231-CV
No. 02-18-00232-CV

_____

IN THE MATTER OF H.C.

On Appeal from County Court at Law No. 1
Denton County, Texas
Trial Court Nos. JV-2018-00258, JV-2018-00259, JV-2017-00916

Before Bassel, Gabriel, and Pittman, JJ.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

## I. Introduction

After fifteen-year-old Appellant H.C. (Holly)[1] assaulted an assistant principal with a knife, she was placed in the Denton County Juvenile Detention Center. Two months later, Holly was released from detention on orders of release to the home of her aunt and uncle, who are her legal guardians. While on orders of release, Holly assaulted two paraprofessionals at an alternative school and was placed back in detention.

The trial court held an agreed adjudication and disposition hearing at which Holly judicially confessed to all three assaults.[2] During the hearing, Holly's aunt, her probation officer, her probation officer's supervisor, and her guardian ad litem all recommended that Holly be placed on general probation. The trial court, however, could not reconcile Holly's high need for services with the recommendation for "the lowest amount of probation" available and therefore found that Holly had engaged in delinquent conduct that constituted a felony offense and had behavioral health or other special needs that could not be met with the resources available in the

---

[1]To protect Appellant's privacy, we use a pseudonym to refer to her, and we refer to her family members by their relationship to her. *See* Tex. R. App. P. 9.8(c).

[2]Holly also judicially confessed to the offense of bodily injury assault of a family member, which was charged in a fourth case, but that case is not part of these appeals because the trial court entered no disposition on it. *See generally* Tex. Fam. Code Ann. § 54.04(c) ("No disposition may be made under this section unless the child is in need of rehabilitation or the protection of the public or the child requires that disposition be made.").

community.  *See* Tex. Fam. Code Ann. § 54.04013.  The trial court signed an amended order of adjudication and disposition in each case committing Holly to the Texas Juvenile Justice Department (TJJD) for an indeterminate sentence, not to exceed her nineteenth birthday.

In three issues, Holly argues that the trial court misapplied Texas Family Code sections 54.04(i)(1)(B) and 54.04013 to the facts and that the evidence is legally and factually insufficient to support the trial court's findings under section 54.04(i)(1)(A)–(C).  Because we conclude that the trial court did not abuse its discretion in making its findings under section 54.04(i)(1) or under section 54.04013, we affirm.

## II.  Factual and Procedural Background[3]

### A.  Holly's Childhood

Holly's aunt testified that Holly and her older brother came to live with her and her husband when Holly was three years old because the Oklahoma Department of Human Services (DHS) recommended that the children be taken care of while DHS investigated the death of Holly's younger brother who had died while in Holly's mother's custody.  At that time, Holly was nonverbal and was not toilet-trained. Holly was diagnosed with a developmental delay and qualified for the Public

---

[3]The agreed adjudication and contested disposition hearing began on June 27, 2018, and reconvened on July 17, 2018.  Due to the short time span between the two hearings, we summarize the testimony presented at the hearings as if it were given on a single date.

Preschool for Children with Disabilities, which she attended for two years before starting kindergarten.

Holly began counseling (in the form of play therapy) at Cook Children's from the time she began living with her aunt. The counseling was to address the issues involved with her having suffered a traumatic event—she was in the house when her younger brother was found dead. She remained in counseling at Cook Children's until third grade.

When Holly was in second or third grade, Holly's aunt noticed that Holly was falling behind her peers and was not reading well, so she was tested and was diagnosed with ADHD. Holly began taking medication for ADHD, which improved her behavior in the classroom but wore off by the time she got home from school. Holly's aunt described Holly's behavior at home as including "sneaking, lying, deceitful behavior, just mischievous."

In third grade, Holly was diagnosed with diabetes and celiac disease. By changing Holly's diet, her aunt was able to improve Holly's behavior temporarily.

In middle school, Holly attended general education classes but received inclusion services; she made poor grades because she would not turn in her schoolwork. Holly's aunt reported that Holly was sent to in-school suspension once for saying a bad word. Towards the end of Holly's eighth-grade year, Holly's aunt started noticing "a lot of depression" in Holly after a girl at school assaulted her for no apparent reason.

**B. Holly Begins Treatment for Depression**

In response to Holly's depression, Holly's aunt took her to see a counselor at Trietsch United Methodist Church on a weekly basis and continued to do so for fourteen months. Holly's aunt participated with Holly in the counseling. During the sessions, they talked about whatever was bothering Holly that week, her thought process, and any problems at school or at home and then determined how they could work on those things over the course of the next week.

**C. Holly's Suicide Attempts and Resulting Hospitalizations and Treatments**

In November of her ninth-grade year, Holly attempted suicide by cutting herself and was hospitalized at Universal Behavioral Health (UBH) in Denton for seven or ten days.[4] At UBH, the mental health professionals talked with Holly about various ways to process different types of emotions and gave her pictures to help her identify what emotion she was feeling. Holly's aunt testified that the treatment was inadequate.

After she was released from UBH, Holly was referred to the Northpointe Program and successfully completed the program. Holly also began being treated by psychiatrist Dr. Islam, who was still her treating physician at the time of the disposition hearing. Holly's aunt testified that Holly was diagnosed with bipolar

---

[4]During her testimony, Holly's aunt gave two different lengths for this hospital stay, so we include them both.

disorder and major depressive disorder and began a medication regimen. But Holly's aunt testified that the medications "didn't seem to really help."

In March 2017,[5] Holly was admitted to the Seay Center for suicidal thoughts. Holly remained at the facility for six days, during which time she was diagnosed with depression, and her medication was changed.

That same month, Holly overdosed on her aunt's antianxiety medication. Holly was taken to the emergency room and was transferred to UBH, where she stayed for twenty days.

UBH released Holly to the San Marcos Treatment Center, where she stayed for seven weeks. When Holly was released from the San Marcos Treatment Center in June 2017, she went to the Excel Center in Lewisville for intensive outpatient treatment for five weeks. While Holly was at the Excel Center, she would not follow the staff's orders and did things that she was not supposed to do, so they instructed Holly's aunt not to drop off Holly early.

When asked if she had seen any improvements in Holly since she had undergone treatment from March through July 2017, Holly's aunt said, "No. Her behavior seemed the same. The medication didn't seem to be making a difference."

---

[5]The record includes references to both March 2016 and March 2017. We set forth the date Holly's aunt gave during her testimony, which tracks with the dates leading up to the events that form the basis of the three offenses.

After Holly finished intensive outpatient treatment at the Excel Center, she saw a special counselor at school once a week for thirty minutes because she qualified as a student with an emotional disturbance.

### D.  Steady Decline in Holly's Behavior after Treatments

Holly's aunt testified that Holly went on a church mission trip during the summer of 2017.  Afterwards, the church sent a letter to Holly's aunt and uncle requesting that Holly not participate in any future youth activities at the church because her behavior was "so bad" during the mission trip.

Holly's aunt said that from the fall of 2016 through the summer of 2017, Holly's behavior steadily declined.  When asked if anything since then had improved Holly's behavior, her aunt said, "Not that I can see."

### E.  The Assault Causing Bodily Injury to a Family Member (Holly's Aunt)[6]

On October 12, 2017, Holly told her aunt that her blood sugar was low and that she was going to eat jelly instead of following the protocol that required her to drink juice.  Holly's aunt told Holly that she could not do that because jelly is "like a last resort," and Holly fled the house.  Holly's aunt chased her because she did not want Holly to go into a diabetic coma.  When Holly's aunt caught her, Holly hit her in

---

[6]Although the trial court entered no disposition on this assault, we include it in our factual background because the trial court was free to consider it in placing Holly outside the home.  *See* Tex. Fam. Code Ann. § 54.04(b) (stating that "[a]t the disposition hearing, the juvenile court, . . . may consider written reports from probation officers, professional court employees, or professional consultants in addition to the testimony of witnesses").

the nose; busted her lip; gave her a black eye; and bit her, breaking the skin. Holly's aunt testified that Holly's actions were not a result of her blood-sugar level because Holly had previously assaulted her in the backyard several days before when Holly did not want to do what she was told.[7] Holly's aunt called the police. Holly was initially detained, but because her blood-sugar level did not stabilize, she was transported to the hospital. Because the six-hour detention period expired before Holly's blood-sugar level stabilized, the police called her uncle and transferred custody back to him while she was still in the hospital.

### F. The Aggravated Assault on a Public Servant (the Assistant Principal)

Heather Garrison, an assistant principal at Holly's high school, testified that she went to a classroom on November 9, 2017.[8] Holly was not supposed to be in that classroom, but she was present. A staff member was with Holly because she was required to be escorted to classes due to previous issues that had occurred in the hallway during the break between classes. Garrison instructed everyone in the room except Holly to report to a different location and asked Holly to come to the office. Holly refused, despite being informed that her refusal would result in being suspended. Holly said that she was not leaving the classroom, that no one could

---

[7]During the prior incident, Holly assaulted her aunt with a flip-flop. Holly's aunt testified that Holly thought it was funny and was not concerned for her aunt's safety or welfare.

[8]Garrison testified that while Holly was at her campus, she was in a general education setting with a combination of general education and resource classes because she had been diagnosed with ADHD.

8

make her leave, that someone would have to drag her out, and that she was there to learn. Garrison radioed the front office and asked them to contact Holly's guardians to let them know that they needed to come pick up Holly. Garrison then sat down at a desk.

Holly mentioned "going to DAEP"[9] and said that she "would really go to DAEP if [Garrison] saw what[ was] in [her] backpack." Garrison did not respond until Holly asked if Garrison wanted to see what was in her backpack. Garrison responded, "If you would like to show me, yes." Holly then retrieved a kitchen knife from her backpack and set it on the desk.[10] She said that she had brought the knife to school to hurt a student during lunch. Garrison texted the other assistant principals, giving them the room number she was in, stating that a student had pulled out a knife, and asking for assistance. While Garrison was texting for help, the knife flew right past her and hit the floor near her feet. Garrison reached down and picked up the knife, which was approximately a foot long, and set it on the table.

Holly then said that she was going into the hall, stood up, and moved towards the door. Garrison was already at the door, and Holly reached around Garrison for

---

[9]DAEP is acronym for Disciplinary Alternative Education Program. *See generally* Tex. Educ. Code Ann. § 37.008(a).

[10]Holly's aunt explained how Holly had acquired the knife that she took to school, despite that they had locked up all sharp items and medication after Holly's two suicide attempts: "When my husband cooked dinner, he cut everybody's steaks so that there would be only one knife out. And he left the knife on the cutting board, and [Holly] took it and put it in her hoodie and then put it in her backpack."

9

the doorknob. Garrison put one hand on the doorknob and her other hand against the door; she did not want to let Holly out of the room because she was fearful for the safety of any students who might be in the hallway. Garrison said that although Holly had been calm until this point, she became louder and appeared to be challenging Garrison to see what she would do. When Garrison would not let Holly exit the room, Holly pulled on Garrison's arms to remove her from the door and hit Garrison's hands with her back. When Holly was unsuccessful in pulling Garrison away from the door, she became agitated and angry and told Garrison to get out of her way. Garrison kept telling Holly to please step back and to move away from her. Holly did not obey Garrison's requests but instead briefly took her hands off Garrison and hit Garrison's head with a closed fist. Garrison kept her hands down by her side, and Holly walked away. Garrison then took the knife off the desk and moved it closer to her, grabbed her radio, and called for assistance. While Garrison radioed for assistance, Holly picked up a chair and threw it towards Garrison. The chair fell just short of Garrison. Holly stopped after she threw the chair. Garrison described Holly as appearing out of breath and exhausted.

In response to Garrison's text for help, the other assistant principals arrived in less than one minute, and Garrison explained to them what had happened. The campus police officer also arrived, put herself between Holly and the assistant principals, and directed Holly to sit in a chair; Holly complied. The police officer asked Garrison what had happened and then handcuffed Holly and escorted her out

10

of the classroom. As she left the classroom, Holly said, "Miss Garrison, does your head hurt? I hope your head hurts. I hope you have a concussion. I hope you die from it. I bet your head really hurts."

## G. The Initial Detention

Following the aggravated assault on Garrison, Holly was expelled from school for forty-five days and was placed in juvenile detention.[11] On January 2, 2018, Holly was released to her aunt and uncle on orders of release.

## H. Holly's Actions Outside School While She Was on Orders of Release

On the day that Holly was released from detention, she accessed Facebook using a Nintendo[12] and posted a threat to the girl that she had intended to use the

---

[11]The State filed a "Petition Re Child Engaged In Delinquent Conduct," alleging

> [t]hat on or about the 9th day of November, 2017, in Denton County, Texas, said [Holly] did violate a penal law of this State, punishable by Imprisonment to-wit: Section 22.02 of the Texas Penal Code, in that the said child did then and there intentionally, knowingly, and recklessly cause bodily injury to Heather Garrison, hereafter styled the complainant, by striking complainant, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a knife, during the commission of the assault, and the defendant did then and there know that the complainant was then and there a public servant, to-wit: employed as an Assistant Principal in [Holly's] School District, and that the complainant was then and there lawfully discharging an official duty, to-wit: Assistant Principal at [Holly's] High School . . . .

[12]Prior to Holly's return, her aunt and uncle took away all cell phones, computers, and iPads, not realizing that Holly could still access Facebook through the Nintendo.

11

knife on, saying that she was still coming for her.[13] Holly's aunt said that Holly made

additional threats against the girl while Holly was at the beauty salon.

Also while on orders of release, Holly reported her aunt and uncle to CPS two

different times. In the first referral, Holly reported that her aunt and uncle were not

feeding her or giving her medication, and in the second referral, she reported that her

aunt had assaulted her. Holly's aunt testified that those accusations were not true and

that CPS had closed the cases as unfounded.

## I. The Threats to Her Teacher and
## the Assaults of the Public Servants (the Paraprofessionals)

With regard to Holly's schooling, the school district's Admission, Review, and

Dismissal (ARD) committee made the decision to place Holly in the TEAMS

program,[14] which is located at a different campus from Holly's high school. Goals

were put into place that Holly had to meet before there would be discussion of how

to transition her back to her high school.

---

[13]Holly posted the following message on Facebook on January 2, 2018:

> I got expelled from [school] and got arrested at school[.] [T]ell the
> people who are close to [F.H.] that I got arrested because I kind of
> brought a knife to school and threw it at Mrs. Garrison[,] and I threw a
> chair and punched her during 1st period. Tell them I am coming after
> [F.H.] Please. That knife was going to be going to her.

[14]The TEAMS acronym stands for Teaching for Emotional, Academic, and
Motivational Success. *See* https://www.lisd.net/domain/6014 (last visited Mar. 8,
2019).

Kimberly Elizabeth Woods, who is a high school Behavior Improvement Classroom (BIC) teacher at the TEAMS campus, testified that Holly was assigned to her classroom in January 2018. Woods said that Holly's aunt emailed her to warn her to "watch herself" because Holly had talked about hurting Woods and was making plans to hurt her and expressed that based on past experience, Holly was not capable of long-term good behavior. Holly had told Woods that she wanted to stab her with a pencil and that she wanted to hit her.

Woods said that Holly saw the school psychologist quite frequently—a couple of times each week or even a couple of times each day—depending on the situation. Woods said that Holly saw the school psychologist more often than what was listed on her ARD paperwork due to her behavior and her outcries, which included being upset about a situation at home, not being able to handle herself in the classroom, and wanting to hurt herself.[15] The suggestions that the school psychologist made were implemented in the classroom and temporarily improved the situation, but Holly's behavior fluctuated. During the four months that Holly spent in Woods's classroom, Holly went to the monitor room more than five times for throwing things in class, throwing things at Woods, threatening to hurt someone, threatening to hurt herself, and trying to leave the building. While Holly was in the monitor room, Woods saw her push, shove, and fight with staff members.

---

[15]Holly's aunt testified that the school had contacted her regarding Holly's outcries of self-harm. Holly's aunt said that despite having locked up all the medications and sharp objects, Holly still scratched herself with her fingernails.

13

On April 3, 2018, Holly went to the monitor room because she was throwing things in the classroom and tearing up things. Holly fought with the staff—biting, scratching, and pushing against them to try to leave the room. Staff members attempted to put Holly in a restraint to stop her actions and to prevent her from hurting herself. During this time, Holly said that she wanted to slap various people who were in the room.

On April 4, 2018, Woods went to the monitor room with Holly and took notes on her behavior. Holly fought with the paraprofessionals, Alisa Green and Mr. Milton, who were trying to restrain her. Throughout the fighting, Holly was laughing. Holly repeatedly poked Green in the arm and said, "Good job ignoring, Miss Green." Green and Milton were not successful in restraining Holly, and she broke free and hit Green in the temple with a closed fist. Afterwards, Holly complained that her hand hurt but then said that pain was her friend. Green left the room and went to the nurse before going to urgent care and being diagnosed with a concussion, which caused her to miss a couple of days of work.

Shawn Hopson came in and attempted to provide assistance by blocking the door so that Holly could not leave to try to go after Green. Holly was "doing something" to Milton's leg, so Hopson asked Milton to move Holly away from him. Hopson and Milton attempted to perform a team transport, but Holly did not comply; she pulled away from them and hit Hopson in the face with a closed fist. The nurse looked at Hopson and gave him ice for his injury. Holly also hit Milton.

14

Holly was ultimately put in a restraint and remained there until the police arrived.

## J. Second Detention

Holly was transported to the juvenile detention center.[16] She remained in the detention center from April 2018 after she committed the assaults through the time of her agreed adjudication and disposition hearings in June and July 2018.

## K. Recommended Disposition

Holly's case was staffed with a committee[17] in January and in April 2018. After the first staffing in January, the probation department decided to postpone the disposition and seek a psychological evaluation for Holly. After receiving the results

---

[16]Based on the preceding events, the State filed a "Petition Re Child Engaged In Delinquent Conduct," alleging

[t]hat on or about the 4th day of April, 2018, in Denton County, Texas, said [Holly] did violate a penal law of this State, punishable by Imprisonment to-wit: Section 22.01 of the Texas Penal Code, in that the said child did then and there intentionally or knowingly cause bodily injury to Alisa Green, hereinafter called the complainant, and the Respondent did then and there know that the said teacher was a public servant, to wit punching complainant in the head and that the said complainant was then and there lawfully discharging an official duty, to wit: educator.

The State filed a similar petition related to Holly's assault of Hopson.

[17]The staffing committee was composed of various members of the Denton County Juvenile Probation Department, including the assistant deputy director, three supervisors, the placement coordinator, the therapeutic programs coordinator, and the substance abuse program coordinator.

of the psychological evaluation[18] and staffing the case a second time, the probation department recommended that Holly be placed on probation and be considered for the SOAR program.[19]

_____

[18]The only psychological evaluation contained in the record was performed by Dr. Lara Hastings and is dated December 14, 2017. There was some discussion during the trial regarding who had requested the December psychological evaluation and why it was not updated after the two additional felonies; these questions were not resolved. Because it appears that the parties and the trial court relied on the December psychological evaluation and often referred to it as an expert report, we set forth the diagnoses and the recommendations from it. The psychological evaluation states that Holly was diagnosed with major depressive disorder, recurrent and severe with psychotic features; unspecified disruptive, impulse-control, and conduct disorder; and parent-child relational problem with a history of childhood trauma. The psychologist recommended, among other things, that (1) Holly should consistently receive and comply with mental health treatment (including both a psychotropic medication regimen and psychotherapy) recommended by her outpatient mental health treatment providers, with attention to potential fluctuation in the level of intensiveness of mental health treatment she needs; (2) Holly could benefit from an intensive increase in the level of structure and supervision; (3) if and when Holly is returned to the care of her aunt and uncle, a safety plan should be developed and implemented specifying precautions to be taken to ensure Holly's aunt's and others' safety in Holly's presence as well as steps to be taken if and when Holly escalates and exhibits aggressive behavior; (4) Holly should receive regular psychiatric follow-ups to monitor and manage her psychotropic medication regimen, with attention to potential fluctuation in the level of intensiveness of psychiatric treatment she needs; and (5) Holly should be monitored closely with regard to her potential for suicidal ideation and self-harming behavior.

[19]The SOAR program was started in 2016 to serve children who have a diagnosed mental health issue, have been adjudicated juveniles, and are at risk of being removed from the community. "SOAR" does not have a specialized meaning and is not an acronym. _See_ "New Juvenile Mental Health Court in Texas Helps Youth Recover As They Are Held Accountable," https://jjie.org/2017/11/13/new-juvenile-mental-health-court-in-texas-helps-youth-recover-as-they-are-held-accountable/ (stating, "So you might be asking what SOAR means. It means whatever it means to you and, more importantly, whatever it means to the young people in our court.") (last visited Mar. 8, 2019).

In order to be considered for placement in the SOAR program, the district attorney's office must agree to staff the case. If the district attorney's office declines to staff the referral, as happened here, the process ends. Knowing that the district attorney's office had declined to staff the referral for Holly, the probation department did not change its recommendation but instead continued to recommend general probation in her aunt and uncle's home for six to twelve months. The probation department applied to five other placement facilities for Holly, but she was not accepted to any of them.

## L.  Holly's Aunt's Reasoning for Requesting Probation for Holly

Holly's aunt testified that she wanted Holly to be released back into her care on probation. Holly's aunt opined that she and her husband could provide the supervision that Holly needs in order to meet any conditions of probation. But Holly's aunt admitted that it is not possible for her to be present with Holly at all times and agreed that she and her husband had previously told the probation department that they did not have adequate control over Holly.

Holly's aunt had met with the probation department to discuss the services that would be available to Holly on probation and believed that Holly would benefit from those services—some of which she had not previously received. When asked what services were being offered by the probation department that Holly had not previously received, Holly's aunt responded, "[W]ell, just probation itself. She's never

17

. . . been on probation.  And then the outpatient therapy through -- I think it's Grace -- is not something that we've done before."

During Holly's aunt's testimony, defense counsel and the State tried to determine what services Holly had previously received.  Although Holly's aunt initially testified that Holly had not received anger management therapy, intensive individual therapy, and family therapy, Holly's aunt made concessions on cross-examination. Holly's aunt conceded that anger management could include problem-solving skills and cooling-off strategies and that these items had been addressed by Holly's school counselor.  Holly's aunt also admitted that Holly had received individual intensive therapy "many, many times," including while she was at UBH, while she was in the Northpointe Program, while she was at the San Marcos Treatment Center for seven weeks, while she was at the Excel Center, and while she was at the Seay Center. Holly's aunt further admitted that they had undergone family therapy with Holly at UBH, the San Marcos Treatment Center, and the Excel Center.  On redirect, Holly's aunt agreed that the prior therapy and counseling did not have "these offenses in mind when they were trying to help her."  Holly's aunt believed that there were services available that would have Holly's offenses in mind and would help rehabilitate her.  But Holly's aunt also admitted that she had previously testified that "nothing"—different types of behavior management and therapies—worked with Holly.

Holly's aunt testified that if Holly were released from detention back into her home, she would continue to see her psychiatrist on a monthly basis, she would have therapy on a weekly basis, she would continue to have access to counseling at school on an as-needed basis, and they would continue to keep all sharp objects and medications locked up. Holly's aunt said that they would keep the community safe by keeping Holly at home, though she acknowledged that Holly was required to go to school. Holly's aunt said that she did not have a plan for how to keep the community safe when Holly was out of her home. Holly's aunt was uncertain how Holly would handle the rigors of the classroom with having to follow specific instructions. Holly's aunt said that she was concerned for the safety of the girl that Holly was upset with and for the teachers' safety because Holly "can't control herself" and "might hurt somebody" when she gets upset.

Holly's aunt was not present when Holly committed the two offenses while on orders of release and had concerns that Holly could commit new offenses when she was not in Holly's presence. Holly's aunt said that she was willing to report any violations that Holly might commit while under orders of probation.

Holly's aunt admitted that Holly might also hurt her and her husband. Holly's aunt admitted that she had testified at prior detention hearings that she was in fear for her life from Holly. Holly's aunt was concerned that Holly would make more unfounded allegations to CPS because she had already made two and because she had a history of lying and of manipulating situations.

Yet Holly's aunt testified that Holly's placement in her home would be in Holly's best interest and that it would not be in Holly's best interest to remove her from the home and place her in TJJD or some other secure placement facility. Holly's aunt explained, "I feel like it's a psychological problem and not a criminal issue, and so I don't think that treating her like a criminal is the best option."

When the trial court asked Holly's aunt what she would do differently to keep Holly from assaulting and killing her, Holly's aunt responded, "Nothing. We would do what we did when she was ordered released last time." When asked how that was in Holly's best interest, her aunt said that she did not know.

## M. The Probation Department's Justification of Probation

### 1. Testimony from Holly's Probation Officer

Juli Looper, an intensive supervision juvenile probation officer with Denton County, testified that she had been a juvenile probation officer since 2003 and had been Holly's pre-court officer since October 2017. After having many conversations with Holly, reviewing the offense reports and "a little bit of school records," interviewing her aunt and uncle, and noting Holly's behavior while on orders of release, Looper said that she had made a recommendation for the disposition of Holly's case.[20]

---

[20]Looper's written recommendation summarizes the information she obtained in her interviews and attaches the police offense reports, the results of the psychological examination, and the results of the PACT assessment.

Looper testified that it was not in Holly's best interest to be placed outside of her home and that reasonable efforts had not been made to prevent or eliminate the need for Holly's removal from her home. Looper opined that Holly's home could provide the quality of care and level of support and supervision that she needs to meet the conditions of probation.[21]

According to Looper, the probation department believed that Holly would benefit from services offered through the probation department, including individual counseling, family counseling, life skills programs, the Junior Anger Management Program, and the General Offenders Program. When asked how she knew that the services offered through the probation department would be different than the services that Holly had already received, Looper responded that she did not know if they would be different and agreed that they could be the same services that Holly had already received.

Looper testified that prior to the probation department's recommendation, Holly was given a Positive Achievement Change Tool (PACT)[22] Assessment, which showed that her overall risk to offend is high and that her need level is high. Looper agreed that the PACT report dated May 10, 2018, contained inaccurate information,

---

[21]Looper said that it was the probation department's hope that Holly's family would continue working with her psychiatrist to address Holly's suicide attempts and suicidal ideations because her psychiatrist was familiar with her history and because the probation department does not have psychiatrists on staff.

[22]*See generally In re J.R.C.S.*, 393 S.W.3d 903, 909 (Tex. App.—El Paso 2012, no pet.) (defining the acronym "PACT").

such as the following: for the number of "Against-person felony referrals," it stated "One or Two" instead of four total; the "Weapon referrals" showed "None," which ignored that Holly had a knife during the aggravated-assault-of-a-public-servant offense; and for the number of times she was detained in the detention facility, it stated "One" instead of two. Although Looper agreed that the PACT report could not be accurate because the underlying information was not accurate, she later clarified that even with the underreporting of items in the PACT report, Holly was at the highest risk level.

Looper testified that the attitudes and behaviors section of the PACT was self-reported and that based on Holly's answers to various questions, the report reflected that Holly did not have empathy for her victims, that she had no respect for other people's property, and that she had defied or was hostile to authority figures. In the skills section, which was based on a combination of Holly's responses to questions and her behaviors, the PACT report stated that Holly did not have techniques to control her impulsive behavior and that she rarely used alternatives to aggression.

Looper stated in her report that the probation department uses the Progressive Sanctions Guidelines for the purposes enumerated in Texas Family Code section 59.001;[23] that Holly's Progressive Sanction Guideline Level is a 6;[24] but that the

---

[23]Texas Family Code section 59.001 states,

The purposes of the progressive sanctions model are to:

22

probation department was nevertheless recommending a guideline level of 3, which

the probation department believed best corresponded "to the seriousness of the

current alleged offense, prior delinquent history, special treatment or training needs,

and/or effectiveness of prior interventions." In other words, the probation

department recommended a guideline level of 3 because it corresponded with its

recommendation that Holly be placed on probation and apply to the SOAR

---

(1) ensure that juvenile offenders face uniform and consistent consequences and punishments that correspond to the seriousness of each offender's current offense, prior delinquent history, special treatment or training needs, and effectiveness of prior interventions;

(2) balance public protection and rehabilitation while holding juvenile offenders accountable;

(3) permit flexibility in the decisions made in relation to the juvenile offender to the extent allowed by law;

(4) consider the juvenile offender's circumstances;

(5) recognize that departure of a disposition from this model is not necessarily undesirable and in some cases is highly desirable; and

(6) improve juvenile justice planning and resource allocation by ensuring uniform and consistent reporting of disposition decisions at all levels.

Tex. Fam. Code Ann. § 59.001.

[24] *See generally id.* § 59.003(a) (setting forth the seven levels and stating that "for a felony of the first degree involving the use of a deadly weapon or causing serious bodily injury, . . . the sanction level is six"), § 59.009(a) (stating that "[f]or a child at sanction level six, the juvenile court may commit the child to the custody of the [TJJD] or a post-adjudication secure correctional facility").

program.[25] Looper agreed that she had considered the victims of Holly's offenses,[26] including Garrison whom Holly threw a knife at, as well as the offenses and the facts of the offenses and had still lowered the Progressive Sanction Guideline Level from a 6 to a 3. Looper agreed that even with Holly's two new offenses, the probation department did not change its recommendation.

Looper testified that since October 2017, the only change that was made in the home to address Holly's needs was to put guidelines in place that Holly would not be left alone with her aunt because Holly could be a danger to her aunt. Looper agreed that the probation department was recommending that Holly return home to a place where someone could be put in danger by Holly's presence.

The State asked Looper the following:

Q. What does probation have specifically to protect the community if [Holly is] released?

A. It would be [Holly] working with the department and her decisions to complete what's being requested through the services that we can provide.

Q. But you don't know if those services are different than what she's already had, correct?

A. Correct.

---

[25] *See generally id.* § 59.006(a)(1), 5) (stating that "[f]or a child at sanction level three, the juvenile court may . . . place the child on probation for not less than six months; . . . [and] require the child or the child's parents or guardians to participate in programs or services designated by the court or probation officer").

[26] But Looper also testified that she did not reach out to any of Holly's victims for their input and that their input "could be important."

24

Q.  So you're asking for her to be returned to the same home that she's assaulted someone in, correct?

A.  Correct.

. . . .

Q.  To the same community in which she assaulted three teachers, correct?

A.  Correct.

Q.  How is probation going to protect the community?

A.  By offering [Holly] the ability to learn skills to change those behaviors.

Q.  Has she had that ability prior to being put on probation?

A.  I don't know if she has.

Q.  Don't you think that's important to know?

A.  Yes.

Q.  So just to clarify, probation's recommendation is six to twelve months of probation in the home for an aggravated assault on a public school teacher, two other assaults on public servants, and an assault in the home on her aunt?

A.  That was the department's -- that is the department's recommendation.

The trial court then questioned Looper about the staffing committee's decision to recommend probation in light of Holly's failure to abide by the orders of release:

You testified that Orders of Release were kind of relaxed orders for somebody to follow. If there was a[n] Orders of Release violation on 1/2 of 2018, how did the staffing committee come up with the idea that

25

[Holly] could follow rules of probation if she couldn't follow rules of release?  Was that addressed?

A.  No.  It wasn't addressed in the staffing committee.

Q.  It didn't even come up?

A.  It did not.

Q.  But the violations were before the staffing.

A.  Correct.

. . . .

Q.  What did the staffing committee say about the idea that the aunt feels like [Holly] could kill her?

A.  We look at from the time that [Holly] first went into detention and when she was placed on Orders of Release.

Q.  That she violated.

A.  That she violated with new offenses at school.  But she was -- [Holly] was doing better in the home specifically.

Q.  And that there was basically an all-hours buffer between [Holly] and her aunt and that all sharp objects were locked up?

A.  Correct.

Q.  And there was testimony at detention hearings from the uncle that that all-hours' supervision couldn't happen all the time; is that right?

A.  I don't recall that.  I'm sorry.

. . . .

Q.  And then was it considered in the staffing that her self-report to the expert that did her evaluation was that she considered herself to be homicidal?  Did that come up?

A. It wasn't -- the -- everyone in the -- everyone was provided the report. That wasn't something that I remember specifically came up in April, in the April staffing.

Q. So during a staffing wherein probation in the home was recommended, it was never mentioned that the young lady thinks she's homicidal?

A. I don't think that we discussed that in the staffing.

The trial court also asked Looper what the staffing committee looked at to deviate the Progressive Sanction Level Guidelines from a 6 to a 3. Looper explained that the staffing committee had considered Holly's improved behavior in the home from January 2 through April 4. The trial court continued to try to understand how the staffing committee had concluded that someone with "the highest need for services" should receive "the lowest amount of probation" available. Looper responded, "[B]ecause our recommendation was to submit application review for SOAR." The trial court clarified, "But . . . there were people on the staffing committee [who] kn[e]w that SOAR was not an option, . . . so it came down to continuing to talk about something that wasn't an option?" Looper confirmed, "That was our department's recommendation."

The trial court also questioned Looper about what probation could accomplish by teaching Holly problem-solving techniques because Holly had shown that she knows the right choice to make but does not make it even though there are consequences. Looper agreed that Holly knows what the right choices are and that

27

she does not always make the right choice, but Looper maintained that probation could teach Holly how to "use the skills" and make better choices.

When asked what items on the psychological report would support probation in the home, Looper explained, "We looked at the recommendations that were provided by the psychologist and felt like probation could help monitor some of the recommendations that were provided."

In response to a question about Holly's uncle's position on the recommendations, Looper said that Holly's uncle is torn because he loves Holly and wants her home but is worried that she will not respond to any services that are provided. After Looper confirmed that Holly's uncle works outside the home, the trial court asked who would supervise Holly around her aunt. Looper testified that Holly's grandfather would provide that supervision.[27]

---

[27]The person who was referred to as Holly's grandfather (though he was technically her great uncle because he was Holly's aunt's father) testified that he had assisted with supervising her while she was on orders of release and that he would be available as support if Holly were placed on probation in the home. Holly's grandfather testified that he and his wife travel some and that he would not always be available to supervise Holly when she was alone with her aunt.

Holly's grandfather was not aware that Holly had thrown a flip-flop at her aunt's head and had laughed when it had hit her in the face; that Holly had made a second CPS referral regarding her aunt and uncle's treatment of her; and that in addition to a chair, Holly had also thrown a knife at the assistant principal. Holly's grandfather testified that it is important for him to know what behavior to expect from Holly if he is going to supervise her. Furthermore, Holly's grandfather expressed concerns about the safety of his daughter (Holly's aunt) because Holly had previously assaulted her and could do so again.

28

The trial court inquired why the five potential placements had rejected Holly. Looper explained that the reasons given included Holly's physical health, mental health, and suicidal ideations. The trial court asked, "So was it not a red flag that if all the placements rejected her, that that could be a concern of her continuing on in the community?" Looper responded that the staffing committee did not have the results from the placement applications before them when they made their recommendation and that they did not do a new staffing recommendation after the five rejections were received.

When the trial court asked, "So how is it that probation feels it's in the best interest of the young lady to be released into a home where people have a basis that she's going to kill them or a person has a basis that she'll be killed," Looper responded that the staffing committee had looked at the fact that Holly's aunt and uncle had indicated that they wanted Holly back in their home and that they had put procedures in place to attempt to prevent anything from happening. But Looper acknowledged that the staffing committee did not discuss the false CPS referrals that Holly had made because that information was not provided until after the case was staffed.

The trial court concluded by asking if the staffing committee had discussed Holly's aunt and uncle's position that they cannot control her in their home. Looper said that they discussed that Holly's aunt and uncle felt that way in the beginning but that her behavior had improved in the home while she was on orders of release;

29

during that time, guidelines were put into place requiring a second person to be present so that Holly was never alone with her aunt.

## 2. Testimony from Looper's Supervisor

Kristy Nathan, the supervisor of the Pre-Court Unit for Denton County Juvenile Probation, testified that she was familiar with the services offered by the probation department and that she reviewed recommendations for dispositions. Nathan said that even knowing that the district attorney's office had not approved Holly for the SOAR program, the department was still recommending that she be placed on probation in the home.

Nathan testified that the probation department has services available, including in-home counseling for the family, and could contract out, work with, or refer her to other agencies for individual and family counseling and mental health support. Nathan opined that she believed that probation in the home through the department could offer the type of structure recommended by the psychological evaluation.

Nathan testified that the prior services that Holly had received did not address her four offenses because the offenses were committed after her treatment. Nathan testified that the probation department has programs and services that would help rehabilitate Holly from her offenses.

Nathan testified that the department did not believe that it was in Holly's best interest to be placed outside the home and opined that her aunt and uncle could provide the quality of care and level of support that Holly needs to meet the

conditions of probation. Nathan did not believe that reasonable efforts had been made to prevent or eliminate Holly's removal from her home because the "department ha[d] not worked with her to look at those reasonable efforts."

On cross-examination, Nathan said that she had not spoken to Holly's aunt and uncle and did not know the condition of Holly's home or how her aunt and uncle operated their home. But based on Holly's aunt and uncle's willingness to take her into their home and work with her, Nathan believed that Holly's aunt and uncle could provide the necessary protections. Nathan acknowledged that Holly had committed two new offenses while she was under her aunt and uncle's supervision while on orders of release but said that she still believed that the probation department could work with them and that they would be able to supervise Holly.

Nathan testified that even though the probation department was aware of Holly's homicidal ideations and her four assaults, the department had lowered her guideline from a 6 to a 3 "[i]n keeping with the recommendation for her to be on probation and with the application to SOAR." Nathan agreed that the report prepared by Dr. Hastings stated that Holly has the potential to be abusive and to jeopardize the safety of others and is in need of very intensive interventions to address her behavior.

When asked what the programs at UBH, the San Marcos Treatment Center, the Seay Center, and the Northpointe Program, as well as the counseling at school, had not addressed that probation services could, Nathan admitted that she was not

31

familiar with the details on some of the programs Holly had participated in. Nathan agreed that some of the programs "could [have] provide[d] everything that probation has available and even more."

Nathan reiterated that the probation department stood by its recommendation of twelve months' regular probation in the home. The State then asked the following questions:

Q. And you want to send [Holly] back into the home where she assaulted her aunt?

A. Yes.

Q. And back into the schools where she assaulted three teachers?

A. If that's the school that she is supposed to be attending, yes.

Q. How does that protect the community's safety?

A. [Holly] needs to be given the opportunity to work with the probation department and the services that can be supplied to her while in those settings on a consistent and regular basis, which I don't believe has been done up to this point. She's been in detention for a couple of times over the last six months in this setting. I don't know how long she was in the school setting before she came into detention. I think that was a new school that she was at.

Q. What services can a probation officer provide her that she's not already being provided through the school setting, through her home, or through private therapy?

A. We have multiple services as counseling; in-home counseling, family counseling. We have community resources. The probation officer can put those together with the family and assist them the whole time that the child is under court orders and on probation.

Q. So there's -- what she's -- could be offered by probation is nothing different than she's already been provided privately as far as you know; isn't that true?

A. Yes, I believe so. . . .

The trial court questioned Nathan regarding whether she knew what precautions were put in place in the home for Holly to succeed there, but she did not have any details on that. The trial court talked with Nathan about the probation department's ability to help Holly by giving her tools and resources to make better decisions when the PACT report stated that she understood consequences, could analyze the situation, but chose to not make the best choice and asked the following:

Q. So would that not be a concern with someone with a history of assaultive behavior; that if you went back into the community, would those same behaviors occur because she says she's -- already knows the consequences and knows -- can analyze the situation?

A. Yes. It could be a concern.

The trial court also asked Nathan if it would be a concern that Holly had committed two new felonies after the expert's report was completed because the staffing committee relied on the expert's recommendation in reducing the level from a 6 to a 3; Nathan agreed that would be a concern.

## N. The Guardian Ad Litem's Rationale for Supporting Probation

Holly's guardian ad litem stated in her opening statement that it was not in Holly's best interest to be sent to TJJD; she recommended that Holly be placed on probation and opined that Holly could be successful in the community. Holly's

guardian ad litem said that the probation department had recommended that Holly be placed with her aunt and uncle because they had "shown in the past that they do have the ability and know when to get [Holly] treatment."

During closing arguments, Holly's guardian ad litem stated that she recognized the trial court's and the State's concern regarding Holly's behaviors but stated, "[T]o send a child who has not had the opportunity to benefit from any of the programs that the department has to offer, to send [her] straight to TJJD, I think, is not in [Holly's] best interest." Holly's guardian ad litem said that she had not heard of any inappropriate behavior from Holly while she was in detention and that Holly had complied with her requests, as well as the requests of the staff at the detention facility and of the people who had counseled with her.

## O. The Trial Court's Disposition

Before making its disposition, the trial court noted numerous concerns, including that Holly had committed two new felonies while on orders of release, that she had serious diagnoses, that there were no other available placements, that she had a Progressive Sanction Guideline Level of 6 showing a high need for services and a high risk to reoffend, that the expert's evaluation was conflicting—it "had a common theme running through it . . . of potential for violence"—but nevertheless recommended that "we could handle all things in the community," that there was no update to the expert's evaluation after the two new felonies, that there were many concerning things in the risk factors on the PACT report, and that there was an

34

inability of any family to live with the degree of vigilance necessary here. The trial court then made the removal-from-the-home findings and the additional finding that resources were not available in the community to deal with Holly's diagnoses and committed her to TJJD for an indeterminate sentence, not to exceed her nineteenth birthday, in each of the three cases.

## III. Standard of Review

A trial court has broad discretion to determine a suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct. *In re C.C.B.*, No. 02-08-00379-CV, 2009 WL 2972912, at *3 (Tex. App.—Fort Worth Sept. 17, 2009, no pet.) (mem. op.) (citing *In re H.G.*, 993 S.W.2d 211, 213 (Tex. App.—San Antonio 1999, no pet.)). An abuse of discretion occurs when the trial court acts unreasonably or arbitrarily without reference to any guiding rules or principles, but it does not abuse its discretion simply by basing its decision on conflicting evidence. *See id.*; *In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.). And we will not find an abuse of discretion as long as some evidence of substantive and probative character exists to support the trial court's decision. *C.J.H.*, 79 S.W.3d at 702. In conducting our review, we engage in a two-pronged analysis: (1) was there sufficient information upon which to exercise discretion, and (2) did the juvenile court err in its application of discretion? *C.C.B.*, 2009 WL 2972912, at *3; *see also In re C.C.*, No. 02-17-00216-CV, 2018 WL 1865804, at *3 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op.).

35

Under an abuse-of-discretion standard, the legal and factual sufficiency of the evidence are relevant in evaluating whether the juvenile court abused its discretion. *In re C.G.*, 162 S.W.3d 448, 452 (Tex. App.—Dallas 2005, no pet.). We apply the civil standards of review to Holly's complaints about the sufficiency of the evidence. *See In re D.M.*, No. 02-17-00059-CV, 2018 WL 1630704, at *5 (Tex. App.—Fort Worth Apr. 5, 2018, no pet.) (mem. op.). When determining whether there is legally sufficient evidence to support the finding under review, we consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *In re M.E.*, No. 02-14-00051-CV, 2014 WL 7334990, at *2 (Tex. App.—Fort Worth Dec. 23, 2014, no pet.) (mem. op.). Anything more than a scintilla of evidence supporting a finding renders the evidence legally sufficient. *D.M.*, 2018 WL 1630704, at *5.

When reviewing an argument that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Id.* at *6 (citing *M.E.*, 2014 WL 7334990, at *2; *C.J.H.*, 79 S.W.3d at 703).

**IV. The Trial Court Did Not Abuse Its Discretion by Finding under Section 54.04(i)(1)(B) that Reasonable Efforts Were Made to Prevent Holly's Removal from the Home**

In her first issue, Holly argues that the trial court misunderstood and misapplied section 54.04(i)(1)(B) and improperly committed Holly to the care, custody, and control of TJJD. Holly raises numerous arguments within her first issue, which we discuss in the analysis below.

**A. Applicable Law**

Section 54.04 governs disposition hearings. *See generally* Tex. Fam. Code Ann. § 54.04. The finding that Holly challenges in her first issue is related to the following subsection:

> (i) If the court places the child on probation outside the child's home or commits the child to the Texas Juvenile Justice Department, the court:
>
>> (1) shall include in its order its determination that:
>>
>>> . . . .
>>>
>>> (B) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home[.]

*Id.* § 54.04(i)(1)(B).

**B. The Trial Court's Findings**

The record contains a document entitled "Judicial Findings." The document states,

37

**The court finds that reasonable efforts have been made to prevent or eliminate the need for the child to be removed from (his or her) home. The following services and/or programs were provided:**

. . . .

X The child and/or family was previously referred to the following counseling or psychological services:

*The guardian[s] reported [that Holly had] participated in counseling through Trietsch Memorial United Methodist Church for nine months approximately two years ago. [Holly's aunt] reported [that Holly] was sent to Universal Behavioral Health in November of 2015,[28] for suicidal ideations. She indicated [that Holly] was hospitalized for ten days and diagnosed with [d]epression. [Holly's aunt] advised [that Holly] was referred to the North[p]ointe Program after she was released. She advised [that Holly] successfully completed the program.*

*[Holly's aunt] indicated [that Holly] was admitted to Seay Center in March of 2016,[29] for suicidal thoughts. She indicated [that Holly] remained at the facility for six days. She stated [that Holly's] medication was changed and [that] the psychiatrist also diagnosed [Holly] with [d]epression.*

*[Holly's aunt] reported in March of 2016,[30] [that Holly] was admitted to Universal Behavioral Health for suicidal ideation. She stated [that Holly] was at the facility for ten days before being released. [Holly's aunt] advised that once [Holly] was at home[,] she tried to overdose and was admitted to UBH once again. [Holly's aunt] advised [that Holly] was at UBH for another ten days. [Holly's aunt] advised [that Holly] would do something almost immediately upon returning home to get admitted to UBH again. [Holly's aunt] stated [that] each time [Holly] was admitted[,] she would stay for ten days. [Holly's aunt] advised [that] in May of 2017, UBH was able to help them get [Holly] into the San Marcos Treatment*

---

[28]This date corresponds to the date shown in the report prepared by Looper. But based on the testimony at trial, it appears that the year may have been 2016.

[29]This date corresponds to the date shown in the report prepared by Looper and to part of Holly's aunt's testimony at trial. But based on other testimony from Holly's aunt, it appears that the year may have been 2017.

[30]This date corresponds to the date shown in the report prepared by Looper. But based on the testimony at trial, it appears that the year may have been 2017.

*Center. [Holly's aunt] indicated [that Holly] was at that facility until the second week of June. [Holly's aunt] stated [that] once [Holly] completed that program[,] she was referred to the EXCEL Center for intensive outpatient therapy. [Holly's aunt] advised [that] while at the EXCEL Center[,] [Holly] was diagnosed with [b]ipolar [d]isorder. The family stated that [Holly] had problems while attending the EXCEL Center[] and explained that all the students could be dropped off early, except for [Holly]. [Holly's aunt] stated [that Holly] would refuse to follow the rules of the facility and cause problems if she was dropped off early. [Holly's aunt] advised [that Holly had] completed [intensive outpatient therapy at] the EXCEL Center.*

o The child and/or family is receiving or has previously received services from TDFPS or MHMR.

N/A

o The nature of the circumstances in the child's home, which may include the offense, required the child's removal.

*Applications were submitted on [Holly's] [behalf] to [multiple] placement facilit[i]es[,] and she was denied acceptance to all[] due to her medical needs and/or mental health needs.*

## C. Analysis

Here, the trial court's findings detail the efforts that were made to prevent or eliminate Holly's removal from the home and to make it possible for Holly to return to her home. Holly does not deny that she received the services listed above but argues that the trial court wrongly determined that "reasonable efforts were made to prevent or eliminate the need for [her] removal from the home" because she had never received programming services through the probation department. Holly implies that the only services that qualify as "reasonable efforts" are services offered by the probation department. As set forth above, the statute requires a finding that "reasonable efforts were made"; it does not, however, specify that those efforts must

39

include services through the probation department. Because the statute is clear and unambiguous on its face,[31] we decline to read words into the statute that the legislature did not include. *See Williams v. Williams*, 19 S.W.3d 544, 547 (Tex. App.— Fort Worth 2000, pet. denied) ("If a statute is clear and unambiguous on its face, statutory construction is not necessary, and the statute's words will be given their plain and common meaning."). *See generally Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 46 (Tex. 2015) ("We review statutory construction de novo.").

Additionally, Holly argues that there was no evidence or insufficient evidence to show that the private services she had received were intended to prevent or eliminate the need for her removal from the home. Holly's argument is based on her premise that because "[t]he juvenile justice code is for rehabilitation for offenses," and because the private services "did not have rehabilitation for commission of [an offense] in mind because [Holly] had committed no offenses" at the time she received the services, the services were not intended to prevent or eliminate the need for her removal from the home. Holly's argument, however, ignores the testimony that the State elicited from Looper and Nathan during cross-examination, which reflected that the services that the probation department wanted to offer Holly to rehabilitate her consisted of the same services that Holly had already received to address her behavioral problems.

---

[31]Holly also argues that the statute is ambiguous. Because we have concluded that the statute is unambiguous, we need not further address that portion of her argument.

40

Relying on a scholarly article, Holly also argues that the trial court's interpretation—that the statute includes those services procured by a family for a child before the child is referred to any court for delinquent conduct—is inconsistent with the public interest and with the legislative intent. But case law, including a case from this court, has explicitly allowed the trial court to consider services that a family procures for the child prior to the child's commission of an offense. *See In re J.M.G.*, No. 06-16-00011-CV, 2016 WL 9175816, at *2 (Tex. App.—Texarkana Nov. 29, 2016, no pet.) (mem. op.) (setting forth evidence that appellant had been in and out of "residential care dating back to early childhood," including receiving psychiatric care after being admitted to Glen Oaks Hospital at age seven and being admitted the following year to Timber Lawn Hospital and Terrell State Hospital); *In re T.E.G.*, 222 S.W.3d 677, 681–82 (Tex. App.—Eastland 2007, no pet.) (noting that in making its reasonable efforts finding, trial court considered evidence that mother had sought treatment for fifteen-year-old appellant from MHMR when he was six or seven years old and that doctors had treated him until the year of his first offense); *In re J.D.P.*, 85 S.W.3d 420, 427, 429 (Tex. App.—Fort Worth 2002, no pet.) (setting forth testimony of counselor at alternative school who treated appellant during the year prior to his offense for reckless injury to a child and considering such evidence in analysis). Moreover, Holly received private services near the time of the offenses at issue; she committed the first offense—bodily assault of a family member—within approximately three months of completing treatment at the Excel Center.

Holly also argues that the trial court misapplied the law to the facts by relying on the evidence that five placements had rejected Holly in determining that reasonable efforts had been made to prevent her removal from the home. In the paragraphs leading up to this argument, Holly cites *In re K.L.C.*, 972 S.W.2d 203 (Tex. App.—Beaumont 1998, no pet.). But in *K.L.C.*, in addition to the fact that the probation officer testified that no efforts had been made to rehabilitate the appellant instead of sending her to the Texas Youth Commission (the former name of TJJD), the court stated, "No evidence was introduced that any effort was made to find an alternative to committing K.L.C. to the custody of TYC." *Id.* at 206. *K.L.C.*, which considered as part of its reasonable-efforts analysis whether the probation department had sought other placements, is thus in opposition to Holly's argument because the five placements sought were in an attempt to avoid placing Holly at TJJD.

Holly also relies on *K.L.C.* in arguing that the orders of release "do not serve as reasonable efforts" and are insufficient to support a finding of reasonable efforts. In *K.L.C.*, the appellant returned home for a brief stint before returning to detention for violating orders of release. *See id.* at 205. The Beaumont court considered that fact as evidence of the inadequacy of the parents to supervise the appellant in the home, rather than as reasonable efforts to prevent the appellant's removal from the home. *Id.* at 206. But other courts of appeals have considered evidence of a child being returned to the home in their reasonable-efforts analyses. *See, e.g.*, *In re J.M.*, 433 S.W.3d 792, 795–96 (Tex. App.—Dallas 2014, no pet.) (concluding that reasonable

42

efforts had been made to prevent or eliminate appellant's removal from the home when trial court had suspended disposition hearing to allow appellant to return home for thirty days); *T.E.G.*, 222 S.W.3d at 682 (holding evidence legally and factually sufficient to support trial court's finding that reasonable efforts were made to prevent or eliminate the need for the child's removal from the home where no department services were offered but mother had sought medical treatment for appellant before offenses were committed); *In re C.M.G.*, No. 04-99-00044-CV, 1999 WL 1125423, at *2 (Tex. App.—San Antonio Dec. 8, 1999, no pet.) (not designated for publication) (holding that trial court acted within its discretion when it found that reasonable efforts were made to prevent or eliminate the need for appellant's removal from the home because an attempt to keep appellant in the home had already been made and was unsuccessful). Here, the trial court did not reference Holly's return home on orders of release as part of its reasonable-efforts finding but instead referenced the counseling, numerous hospitalizations, and various treatment programs that Holly had undergone or participated in. This evidence is legally and factually sufficient to support the trial court's section 54.04(i)(1)(B) finding without reference to Holly's release back to the home following the initial detention.

Moreover, Holly argues that "perceptions do not substitute for factual evidence of some effort to avoid the need for the removal of the child from the family home." We agree and need not rely on perceptions because, as detailed above, the record before us contains evidence of the many services that were procured for Holly, and

these services constitute "reasonable efforts" to prevent her removal from the home. Moreover, given the evidence showing a continuing pattern of delinquent conduct by Holly during the fall of 2017 and the spring of 2018, the trial court was not required to first exhaust the alternative of probation. *See In re A.M.C.*, No. 04-11-00116-CV, 2011 WL 6090077, at *4 (Tex. App.—San Antonio Dec. 7, 2011, no pet.) (mem. op.) (not requiring trial court to first exhaust probation and outside placements before placing appellant at TYC).

We conclude that in making its section 54.04(i)(1)(B) finding that reasonable efforts had been made to prevent or eliminate Holly's removal from the home, the trial court did not abuse its discretion by taking into consideration the many private services that Holly's aunt and uncle had sought for Holly prior to her commission of three assaults. This evidence is legally and factually sufficient to support the trial court's reasonable-efforts finding. *See J.M.G.*, 2016 WL 9175816, at *2; *T.E.G.*, 222 S.W.3d at 681–82; *J.D.P.*, 85 S.W.3d at 427, 429. Accordingly, we overrule Holly's first issue.

### V. The Trial Court Did Not Abuse Its Discretion by Finding that Section 54.04013 Was Satisfied

In her second issue, Holly argues that the trial court abused its discretion when it found that section 54.04013 was satisfied.

Section 54.04013 is as follows:

Notwithstanding any other provision of this code, after a disposition hearing held in accordance with [s]ection 54.04, the juvenile court may

44

commit a child who is found to have engaged in delinquent conduct that constitutes a felony offense to the [TJJD] without a determinate sentence if the court makes a special commitment finding that the child has behavioral health or other special needs that cannot be met with the resources available in the community. The court should consider the findings of a validated risk and needs assessment and the findings of any other appropriate professional assessment available to the court.

Tex. Fam. Code Ann. § 54.04013. Based on the evidence set forth in the initial introduction, the trial court made the appropriate finding.

Holly argues that neither the PACT report nor the expert report recommended probation outside the home; that she does not qualify as emotionally disturbed for educational purposes;[32] that "[t]he family showed that it ha[d] always been able to address [her] behavioral health needs in the community;" and that the probation department believed that it, along with the family, could meet Holly's needs.

Contrary to Holly's argument, the record demonstrates that her family and the resources in the community had not been able to meet her behavioral health needs. As brought to light by the State's and the trial court's questioning of the probation department employees, both the PACT report and the expert report reflected that Holly had significant mental health diagnoses and that the recommended dispositions in those reports did not correspond to the magnitude of Holly's diagnoses. The probation department lowered Holly's Progressive Sanction Guideline Level without any explanation, other than that it justified the disposition that they were

---

[32]This is contrary to her aunt's testimony that Holly did qualify as emotionally disturbed.

45

recommending. All of the mental health treatment that Holly underwent at UBH, the Northpointe Program, the Seay Center, the San Marcos Treatment Center, and the Excel Center was not able to get her back on track and was similar to what the probation department could offer. The counseling that Holly received at school was also not meeting her mental health needs, even though she was meeting with the school psychologist more frequently than the recommended amount set forth in her ARD paperwork, because Holly assaulted two paraprofessionals while in the monitor room at the alternative school she was sent to after she was released from detention. Moreover, Holly's aunt testified that Holly's medications were not working, and Holly's aunt and uncle were unable to monitor Holly twenty-four hours a day, as reflected by the fact that Holly had taken a knife to school from their home despite their efforts to keep sharp objects away from her and that Holly had posted threats on Facebook the day she was released from detention. Moreover, Holly's grandfather was not able to provide backup for Holly's aunt all the time because he traveled.

The trial court's questioning reflected that it abided by section 54.04013's requirement to consider the findings of the PACT report and the expert report but that it had determined that the recommendations of probation in those reports had not considered Holly's two additional felony offenses and fell short of treating Holly's numerous diagnoses. Thus, the trial court did consider the findings of the PACT report and the expert report. But in light of the proven inadequacies of the resources available in the community, as well as those beyond the community, to meet Holly's

behavioral health or other special needs, we hold that the trial court did not abuse its

discretion when it found that section 54.04013 had been satisfied. *See id.*[33] We

overrule Holly's second issue.

## VI. Legally and Factually Sufficient Evidence Supports the Trial Court's Findings under Section 54.04(i)(1)(A), (B), and (C)

In her third issue, Holly argues that the evidence is legally and factually

insufficient to support the trial court's findings under section 54.04(i)(1)(A), (B), and

(C).

### A. Applicable Law

Texas Family Code section 54.04(i) states,

If the court places the child on probation outside the child's home or commits the child to the Texas Juvenile Justice Department, the court:

(1) shall include in its order its determination that:

(A) it is in the child's best interests to be placed outside the child's home;

(B) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to

---

[33]We note that there are only two cases on Westlaw that mention this section of the family code and that neither case deals with whether the trial court abused its discretion in making the section 54.04013 finding. *See generally In re V.C.A.*, No. 13-17-00580-CV, 2018 WL 2372512, at \*1–2 (Tex. App.—Corpus Christi–Edinburg May 24, 2018, no pet.) (mem. op.) (affirming, in case in which an *Anders* brief was filed, appellant's commitment to TJJD for an indeterminate sentence where trial court found that appellant had behavioral health or other special needs that could not be met with the resources available in the community); *J.M.G.*, 2016 WL 9175816, at \*1 (affirming trial court's disposition order committing appellant to TJJD for an indeterminate period, not to exceed his nineteenth birthday; appellant did not challenge the trial court's section 54.04013 finding).

make it possible for the child to return to the child's home; and

(C) the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation[.]

Tex. Fam. Code Ann. § 54.04(i)(1). The trial court made the appropriate findings.

## B. Analysis

Because Holly raises separate challenges to the sufficiency of the evidence to support each of the three subsections above, we analyze each separately.

### 1. Finding under Section 54.04(i)(1)(C)—Adequacy of Home Supervision

Holly argues that her aunt and uncle could provide the level of support and supervision that she needed because she had good behavior for several months after she was released from detention; she violated the orders of release at school, not at home; her grandparents were willing to assist with her supervision; her aunt and uncle had always sought help for her; and Looper and Nathan believed that Holly's aunt and uncle could provide the needed level of support and supervision.

The record, however, justifies the trial court's serious concerns about the adequacy of Holly's home supervision. Although Holly's aunt and uncle did their best to lock up all medications and sharp objects after Holly's suicide attempts, Holly managed to sneak a steak knife into her backpack and take it to school, where she threw it at an assistant principal and said that she had planned to use it to harm another student. Similarly, Holly's aunt and uncle attempted to get rid of any

48

electronics that Holly could use to access social media platforms, but they left out the Nintendo, which Holly used on the day she was released from detention to post a threat to the student whom she had originally planned to use the knife on. Because Holly had assaulted her aunt more than once, guidelines had been put into place requiring that Holly not be alone with her aunt, but Holly's grandfather testified that he and his wife often traveled, leaving Holly's aunt vulnerable to another assault— which Holly's grandfather testified he was afraid would occur. Moreover, while on orders of release and attending an alternative school, Holly assaulted two paraprofessionals, who had received restraint training for how to safely control children when their behavior is out of control. After hearing all of the testimony and reviewing the results of the psychological evaluation and the testing showing Holly's numerous mental health issues, the trial court noted the inability of *any* family to live with the degree of vigilance necessary here.

Accordingly, we hold that legally and factually sufficient evidence supports the trial court's section 54.04(i)(1)(C) finding that Holly could not be provided in her home with the quality of care and level of support and supervision needed to comply with conditions of probation. *See C.M.G.*, 1999 WL 1125423, at *2 (holding evidence legally and factually sufficient to support finding that appellant could not be provided in her home with the quality of care and level of support and supervision needed to comply with conditions of probation, despite probation officer's recommendation).

## 2. Finding under Section 54.04(i)(1)(B)—Reasonable Efforts

To the extent that Holly's third issue re-challenges the trial court's finding under section 54.04(i)(1)(B), we have held above that legally and factually sufficient evidence—including the counseling, hospitalization, and treatment that Holly's family procured for her—supported the trial court's finding.

## 3. Finding under Section 54.04(i)(1)(A)—Child's Best Interest

In her brief, Holly sets forth the testimony from Looper, Nathan, her aunt, and her guardian ad litem related to her best interest and argues that no one testified that it would be in Holly's best interest for her to be committed to TJJD.

Texas Family Code section 54.04(b) states in pertinent part,

(b) At the disposition hearing, the juvenile court, notwithstanding the Texas Rules of Evidence or Chapter 37, Code of Criminal Procedure, *may consider* written reports from probation officers, professional court employees, or professional consultants in addition to the testimony of witnesses.

Tex. Fam. Code Ann. § 54.04(b) (emphasis added). As set forth in the preceding statute, which governs disposition hearings, the trial court was not bound by the recommendations of the probation officers, the guardian ad litem, or Holly's aunt. *See In re C.G.*, No. 05-17-01063-CV, 2018 WL 2126812, at *5 (Tex. App.—Dallas May 9, 2018, no pet.) (mem. op.) (concluding that evidence was sufficient to support statutory findings and that trial court did not abuse its discretion by ordering appellant committed to TJJD despite that probation department did not recommend commitment to TJJD); *In re R.D.R.*, No. 11-12-00287-CV, 2014 WL 4348061, at *8–9

50

(Tex. App.—Eastland Aug. 29, 2014, no pet.) (mem. op.) (concluding that trial court did not abuse its discretion by deciding to remove appellant from his home and place him in TJJD despite probation recommendation from his half-sister with whom he resided and his probation officer).

Here, as noted by the trial court, the recommendation to place Holly on general probation would put her back into the same home and community (i.e., school) in which she had previously assaulted several individuals and had threatened others. The trial court also noted that Holly had "the highest need for services" but was being recommended to receive "the lowest amount of probation" available. The evidence that has been thoroughly detailed above—including that Holly had committed two new felony offenses, in addition to making threats to harm others, while on orders of release; that the PACT report showed that her overall risk to offend is high and that her need level is high; that the psychological evaluation was performed before Holly committed two additional felonies; that she had suicidal ideations and tendencies; and that her aunt and uncle could not supervise her twenty-four hours a day—reflects that it was in Holly's best interest to be placed outside her home. *See In re A.E.E.*, 89 S.W.3d 250, 255 (Tex. App.—Texarkana 2002, no pet.) (holding evidence sufficient to support trial court's finding that it was in appellant's best interest to be placed outside her home based on home study evaluations and counselor's testimony showing that appellant would likely run away again and had a potential to make irrational decisions, including harming herself and possibly her father).

### 4. Summation

Because we have held that legally and factually sufficient evidence supports each of the section 54.04(i)(1) findings, we also hold that the trial court did not abuse its discretion by committing Holly to TJJD for an indeterminate sentence. *See C.G.*, 2018 WL 2126812, at \*4–5 (concluding that sufficient evidence supported each of the three required findings and holding that trial court did not abuse its discretion by ordering appellant committed to TJJD, even though appellant "had never been adjudicated delinquent before these incidents and had never been offered or ordered to receive any rehabilitative services" because evidence showed that he had committed three offenses within a month); *J.D.P.*, 85 S.W.3d at 429 (concluding that "probation, medication, alternative schools, years of weekly counseling sessions, and other types of intervention [had] been attempted and . . . had little or no effect on Appellant's behavior" and holding evidence legally and factually sufficient to support the jury's section 54.04(i) findings). Accordingly, we overrule Holly's third issue.

## VII. Conclusion

Having overruled Holly's three issues, we affirm the trial court's amended orders of adjudication and disposition.

Per Curiam

Delivered: March 14, 2019